In re LESTER.

In re ELIZABETH.

In re FRANCIS.

No. 79–32–Appeal.

Supreme Court of Rhode Island.

July 14, 1980.

John T. MacFadyen, III, Asst. Public Defender, Providence, for respondent.

Chester Lupton, Dept. of Children and Their Families, Providence, for petitioner.

## OPINION

WEISBERGER, Justice.

On December 19, 1977, a physician at the Cranston General Hospital filed "Battered and/or Abused Child Reports" on Francis, then four-and-a-half years old; Elizabeth, then nearly three-and-a-half years old; and Lester, then nearly two-and-a-half years old. The three children are siblings, who, prior to this litigation, resided from time to time with their mother and father and from time to time with relatives or friends. As a result of the physician's reports, ex-parte orders were issued on December 20, 1977, by a justice of the Family Court giving temporary custody of these children to Child Welfare Services. Beginning on October 19, 1978, a dependency-and-neglect hearing was conducted in the Family Court against the parents of the children. Following this hearing, on November 10, 1978, the three children were declared to be dependent, and legal custody of the children was placed in Child Welfare Services, with the admonition by the trial justice that efforts be made to reunite the mother with her children and to accord her reasonable rights of visitation. From this decision on appeal was duly filed on behalf of the mother on November 13, 1978. The facts underlying the court's finding and custody determination are as follows.

Examinations of the three children by a physician at the Cranston General Hospital led to the filing of "Battered and/or Abused Child Reports" on Francis, Elizabeth, and Lester. The doctor found evidence of sexual abuse as to Elizabeth; enlarged tonsils, tracheobronchitis, and dirty skin (and, at an earlier examination, pneu-

monitis and dental deficiencies) on the part of Francis; and dirty skin, as well as bronchitis and crossed eyes, on the part of Lester. The record indicates that the physician had also treated Elizabeth for lice and an acute inflammatory infection of the skin, conditions that were associated with a lack of cleanliness.

A caseworker examined the apartment in which the children had lived from time to time and found it sparsely furnished, cold, and generally disorganized. Evidence adduced from the mother indicated that the father of the children, who lived with her intermittently, had a hot temper, struck the two boys, and had assaulted the mother so violently on a number of occasions that she feared for her own safety and the safety of the children. In part as a result of these fears, she arranged to place the children with friends and with her parents. In December of 1977 only Lester was living with his mother. Evidence of sexual abuse of Elizabeth was equivocal, and the trial justice made no finding that such abuse had taken place.

The general tenor of the evidence created a stark picture of an aggressive and sometimes brutal husband and father and an ineffectual mother. Although the mother had placed her children with others periodically, she was afraid of asserting her independence in respect to her husband and it would have been impossible to predict her response to a demand by the husband that the children be returned to the deficient family home. All three of the children had severe respiratory problems, which the physician from the Cranston General Hospital partly attributed to their having been born prematurely. The doctor also noted that the inability of the parents to care for the children was a probable contributing cause of these illnesses. On the basis of this evidence, the trial justice found that there was not clear and convincing evidence of child abuse, but he found that the evidence was clear and convincing that the children "are without proper parental care and supervision." The trial justice went on to state that the mother "is afraid of what might happen to the children because of

[her husband], and that she is not altogether sure [that] if she left him, * * * she would have the resources to get him out were he to come back." The trial justice declared that the finding of dependency was the only way "that we might be able to protect the children."

The mother argues on appeal that the trial justice erred in finding her children to be dependent. In support of this contention she sets forth the argument that her placement of her children with others assured that they would receive adequate care, even though conditions in her own home may not have been conducive to the welfare of her children. The mother also argues that the trial justice misconceived the evidence and the law in reaching the determination of dependence.

As a threshold proposition, she urges this court to adopt as a rule of law that dependency and neglect proceedings require strict judicial scrutiny since the parents' interests in maintaining the integrity of the family unit and control of child-rearing are fundamental rights. See *Roe v. Conn*, 417 F.Supp. 769, 777 (M.D.Ala.1976) (three-judge court); *Alsager v. District Court*, 406 F.Supp. 10, 16 (S.D.Iowa 1975), *aff'd*, 545 F.2d 1137 (8th Cir. 1976). She argues that the foregoing cases have been based upon the rationale of *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), in which the Court held, pursuant to the Due Process Clause of the Fourteenth Amendment, that an unwed father's interest in retaining custody of his children at least entitled him to a hearing on his fitness as a parent before the children might be removed from his custody. At no point in *Stanley* did the Court discuss the doctrine of strict judicial scrutiny, though it did observe:

"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska*, 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923), 'basic civil rights of man,' *Skinner v. Oklahoma*, 316

U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942), and '[r]ights far more precious . . . than property rights,' *May v. Anderson*, 345 U.S. 528, 533 [73 S.Ct. 840, 843, 97 L.Ed. 1221] (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince v. Massachusetts*, 321 U.S. 158, 166, [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska, supra* [262 U.S.] at 399 [43 S.Ct. at 626], the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma, supra* [316 U.S.], at 541 [62 S.Ct. at 1113], and the Ninth Amendment, *Griswold v. Connecticut*, 381 U.S. 479, 496 [85 S.Ct. 1678, 1688, 14 L.Ed.2d 510] (1965) (Goldberg, J., concurring)." *Id.* at 651, 92 S.Ct. at 1212–13, 31 L.Ed.2d at 558–59.

These rights have not been found by the Supreme Court to be unlimited. In *Parham v. J. R.*, 442 U.S. 584, 604, 99 S.Ct. 2493, 2505, 61 L.Ed.2d 101, 120 (1979), the Court recognized that the parents' right to decide what is in the best interests of their children may potentially be subject to state control when the physical or mental health of the children is jeopardized.

The doctrine of strict judicial scrutiny was developed in two separate contexts. First, the doctrine is applicable when a governmental authority interferes with the exercise of a fundamental right. Secondly, the doctrine is applicable when a suspect classification involving invidious discrimination is found to exist. As to fundamental rights, *see, e. g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right to privacy); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (right to vote); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to interstate travel); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (First Amendment rights); *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed.

1655 (1942) (right to procreate). As to suspect classes, *see, e. g., Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (race); *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race); *Oyama v. California*, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948) (national origin); *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (national origin).

The federal district court in *Alsager* applied strict judicial scrutiny in testing the right of Iowa authorities to terminate the legal relationship between parent and child, a right based upon an Iowa statute which authorized such termination when the parents "refus[e] to give the child necessary parental care and protection" or are "unfit" parents by reason of "conduct * * * detrimental to the physical or mental health or morals of the child." As an alternate ground the court found the standards embodied in the statute to be unconstitutionally vague. It should be noted that the court of appeals in affirming *Alsager* avoided the vagueness doctrine and placed its reliance upon the lack of procedural and substantive due process in the actual termination proceeding. *Alsager v. District Court*, 545 F.2d 1137 (8th Cir. 1976). It should also be noted that in *Alsager* the district court in a footnote specifically stated that

> "[t]he Court is not presently concerned with the child's rights vis-á-vis the parents, even though it realizes that a child has a substantial interest in being free from parental neglect and abuse. The Court is only concerned with the parents' rights, in a termination context, vis-á-vis the state * * *. Plaintiffs' amended complaint does not challenge the Iowa neglect statutes; thus the Court's ruling today does not prevent the state from temporarily separating the child from its parents upon an adjudication of neglect or dependency." 406 F.Supp. at 16 n. 3.

■ With all due respect to the courts that have chosen the application of strict judicial scrutiny on the theory that the

right to raise one's children as one sees fit is a fundamental right, we suggest that a two-dimensional approach in respect to child neglect, dependency, or abuse situations is fraught with grave danger to those children whose welfare only the state may protect. In all such situations the approach should be three-dimensional, with due consideration given to the interests of the parents, the children, and the state. *See Roe v. Conn*, 417 F.Supp. at 780 (where counsel for the child was required to be appointed).

In following the three-dimensional approach, courts must be most careful in the construction of an elaborate edifice of procedural safeguards based upon strict judicial scrutiny that they do not create an impregnable constitutional bulwark behind which private tyranny may proceed undeterred. We therefore decline to adopt the strict-judicial-scrutiny rationale in balancing these interests. In child-abuse and related custody proceedings, we have long espoused the position that the rights of parents are a most essential consideration, but we further recognize that the best interests and welfare of the child outweigh all other considerations. *In re Denise*, R.I., 408 A.2d 606, 607 (1979); *Engelhardt v. Bergeron*, 113 R.I. 50, 57, 317 A.2d 877, 882 (1974).

These principles do not permit interference with parental authority on arbitrary or irrational grounds. We recently stated unequivocally in *In re Jonathan*, 415 A.2d 1036 at 1039 (R.I.1980):

"We hold that the trial justice in a neglect and/or dependency proceeding be required at least to articulate his findings in regard to the emotional and physical welfare of the child in light of the parent's alleged misconduct. Unless the state can prove by clear and convincing evidence that a child is actually suffering or is likely to suffer physical and/or emotional harm, there is no reason to disturb the basic security of a family relationship.
\* \* \*

"We therefore hold that G.L. 1956 (1969 Reenactment) § 14–1–3(H),[1] requires a finding that the allegedly offending conditions or conduct is, or is likely to become harmful to the best interest of the child before the child may be found to be dependent and/or neglected."

Although we cite as a holding in consonance with these principles *Alsager v. District Court*, 406 F.Supp. 10 (S.D.Iowa 1975), aff'd, 545 F.2d 1137 (8th Cir. 1976), we decline at this time to adopt the doctrine of strict judicial scrutiny in respect to child dependency, neglect, or abuse proceedings. While we recognize the right of a family to undisturbed privacy in determining its internal arrangements, as suggested in *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52, 60 (1974); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15, 35 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1078 (1925); and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923), we feel compelled to note that a child also has a fundamental interest in the security of his person, physical well-being, and access to a minimal supply of the basic necessities of life. The state through its power and obligation as *parens patriae* has both a rational and compelling interest in interference in family autonomy when these basic rights of

---

1. General Laws 1956 (1969 Reenactment) § 14–1–3, as amended by P.L. 1969, ch. 252, § 1 reads in pertinent part as follows:

"H. The terms 'dependent' and/or 'neglected' when applied to a child shall mean and include any child—

"Who is homeless or destitute or abandoned or dependent upon the public for support, or who has not the parental care or guardianship or who habitually begs or receives alms, or whose home, by reason of neglect, cruelty, drunkenness or depravity on the part of the parent or parents having custody or control of such child is an unfit place for such child, or any child under eight (8) years of age found peddling in the streets or any child found engaging in an occupation or being in a situation dangerous to life, or limb or injurious to the health or well-being of such child, or who has had physical injury or injuries which may adversely affect his health and welfare inflicted upon him other than by accidental means."

children are violated or threatened. All too frequently the understandable reluctance of child-welfare authorities to intervene in the family relationship, even where evidence of neglect or abuse is present, may result in lasting injury, death, or other irreparable harm to the tiny and helpless victims of parental misconduct. Thus, as we accord due process and all reasonable presumptions in favor of parental authority, we must not erect the barrier so high that it cannot be pierced in order to safeguard these innocent victims. The state's role in protecting children may properly be preventive of harm as well as remedial. *Custody of a Minor*, —— Mass. ——, ——, 389 N.E.2d 68, 73 (1979); *In re Yetter*, 22 Wash.App. 304, 308, 589 P.2d 815, 817 (1979).

When we apply the foregoing principles to the facts of the case at bar, it becomes apparent that the trial justice, in finding the children to be dependent, was acting in both a remedial and a preventive role. It is true the evidence indicated that the children were receiving reasonable care when placed with godparents and the mother's parents; however, the evidence further indicated that the mother herself was ineffectual and that she could not be relied upon to maintain the surrogate parental relationship, particularly if her dominant husband should choose to interfere with such arrangements. As the Court of Appeals of Washington stated in *Yetter*, "[t]he state, under the scrutiny of the court, need not wait until a child's life has been permanently and irretrievably impaired before acting." *Id.* at 308, 589 P.2d at 817.

In this instance we believe that the trial justice was amply supported by the total-record evidence in finding the children to be dependent. His decision gave the mother every opportunity to be reunited with the children, particularly in the event that she should become separated from her husband. We believe that due regard was given to the rights of the parents in the light of the paramount needs and interests of the children.

For the reasons stated, the mother's appeal is denied and dismissed, the decision of the Family Court is affirmed, and the case is remanded to the Family Court for further proceedings.