### In re LEE and Colletta.

### No. 80–504–Appeal.

Supreme Court of Rhode Island.

March 16, 1982.

Carolyn Roundey, Janet Gilligan, Rhode Island Legal Services, Inc., Providence, for appellant.

Thomas M. Bohan, Providence Legal Counsel, Children and Their Families, for appellees.

### OPINION

BEVILACQUA, Chief Justice.

This is an appeal by Marilyn Thomas from a Family Court decree entered on July 24, 1980, awarding care, custody, and control of her minor children Lee and Colletta[1] to the Department of Children and Their

---

1. Lee was born on September 6, 1977, and Colletta was born on April 11, 1969.

Families (the department) because the children were "dependent and neglected," pursuant to G.L.1956 (1969 Reenactment) § 14–1–3(H), as amended by P.L.1969, ch. 252, § 1.[2] The justice also ordered the department to provide a written plan for the eventual reunification of Mrs. Thomas with her children and he ordered the mother to continue psychiatric treatments. The case was continued for review.

A neglect and/or dependency hearing was held in July 1980 and the following evidence and testimony were adduced. On July 2, 1979, the department received a report from a physician at the Fox Point Health Center where Marilyn Thomas had brought Lee for a checkup. The mother told the physician that possibly Lee had been given glass pieces by his father. When the physician left the examining room to inquire about taking X rays of the child, the mother and child left his office. The department attempted to contact the mother during the following two months but was unsuccessful because she moved twice.

Subsequently, on September 10, 1979, Mrs. Thomas brought Colletta and Lee to St. Joseph Hospital to be examined by a physician because the mother complained that Lee was sick. Upon examining both children, the physician found no evidence of child abuse. Nevertheless, a "Physician's Report of Battered and/or Abused Child"

was filed on both children because, according to the report, the mother appeared "psychotic and unable to manage child care."[3] Thereupon, the children were admitted to the hospital for protection.

The following day, a hospital staff member contacted a department caseworker, Mr. Zafar Khan, who met with Mrs. Thomas that afternoon. Mrs. Thomas told Khan that she had brought her children to the hospital because while she was at work, she had visions of an elderly man stepping on Lee's chest and when she returned home, Lee was sick and crying.

On September 14, 1979, Khan took Mrs. Thomas to Butler Hospital for psychiatric examination. The psychiatrist told Khan that Mrs. Thomas was psychotic and needed treatment but that she refused to be admitted or to accept treatment. On the same day, the department filed an ex parte order for detention, and the Family Court justice granted the order, thereby placing Lee and Colletta in the temporary custody of the department. The department also filed a petition with the Family Court on that date alleging that the children were dependent, neglected and/or abused, and seeking their custody.

The children were subsequently placed in foster care, and eventually Colletta was placed in the Ohio home of her natural father who was divorced from Mrs. Thomas.[4]

2. General Laws 1956 (1969 Reenactment) § 14–1–3, as amended by P.L.1969, ch. 252, § 1, in pertinent part reads as follows:
   "H. The terms 'dependent' and/or 'neglected' when applied to a child shall mean and include any child—
   Who is homeless or destitute or abandoned or dependent upon the public for support, or who has not the parental care or guardianship or who habitually begs or receives alms, or whose home, by reason of neglect, cruelty, drunkenness or depravity on the part of the parent or parents having custody or control of such child is an unfit place for such child, or any child under eight (8) years of age found peddling in the streets or any child found engaging in an occupation or being in a situation dangerous to life, or limb or injurious to the health or well-being of such child, or who has had physical injury or injuries which may adversely affect his health and

welfare inflicted upon him other than by accidental means."
   Since the date of the decree, the statute was reenacted by G.L.1956 (1981 Reenactment) but no changes were made in the statutory language of § 14–1–3(H).

3. Dorland's Illustrated Medical Dictionary 1245 (24th ed. 1965) defines "psychotic" as "[p]ertaining to, characterized by, or caused by psychosis," and defines "psychosis" as "[f]ormerly, a generic name for any mental disorder. Specifically, the deeper, more far-reaching and prolonged behavior disorders, such as *dementia praecox* [schizophrenia] * * *." *Id.*

4. The record also indicates that Lee's natural father, who was also divorced from Mrs. Thomas, attempted to have Lee placed with him in his home in Texas. Apparently this attempt was unsuccessful because the required study of his home was never made by the state agency.

During the course of the hearing on the petition, testimony was taken from Zafar Khan and another department caseworker and from a psychiatrist who had examined Mrs. Thomas on several occasions. Khan testified about his initial meeting with Marilyn Thomas at St. Joseph Hospital on September 10, 1979, during which she discussed her visions of harm to Lee. Khan also testified about his subsequent visit with the mother to Butler Hospital on September 14, 1979, for her psychiatric examination that indicated that she appeared psychotic. Khan further testified about conversations he had with the mother during September and October 1979 after the children were placed in foster care. In these discussions the mother expressed fears for the children's health and safety in the foster home. According to Khan, Mrs. Thomas stated that someone was stepping on Lee's chest, that the other foster children would hurt Lee, that the foster parents should not let the children near the stove, and made other similar statements. In response to the mother's concerns, Khan phoned the foster home and was told that everything was fine.

Khan also observed the mother's behavior during supervised visits between the mother and her children on October 1 and October 23, 1979. During the October 1 meeting Mrs. Thomas focused all her attention on Lee and kissed him for ten minutes from head to toe, which behavior Khan characterized as "very strange." At the October 23 meeting the mother became violent; she insisted on changing the foster home and tried to hit Khan, which action necessitated a call to the police.

On cross-examination, Khan testified that when Mrs. Thomas first brought the children to the hospital their physical appearance seemed normal, they were in good care, and they did not exhibit any abnormal emotional problems.

Victoria Gartner, the second caseworker assigned to the instant case, gave testimony similar to Khan's concerning conversations with Mrs. Thomas about fears for the safety of her children. Gartner also observed the mother's total concentration with Lee during supervised visits with both children and characterized the mother's approach to Lee, which consisted of constantly fondling and holding the boy, as "sexual." On cross-examination Gartner stated that the department had no record of physical abuse of the children by Mrs. Thomas, but she did not know whether the record showed neglect or dependency.

Doctor Michael Silver, a psychiatrist and the clinical director of the Adult Outpatient Clinic at the Providence Mental Health Center, testified concerning his treatment of Mrs. Thomas, who had been referred to him initially by the department but who subsequently received treatment voluntarily. Doctor Silver diagnosed Mrs. Thomas as suffering from "a schizophrenic illness, paranoid type."[5] He based his diagnosis on the fact that during his examinations of Mrs. Thomas she was "delusional," expressing unreal fears for her children's safety and manifesting a disjointed thought process. He also testified that the mother's problems centered only on her children.

As to how the mother's mental condition would affect her ability to care for her children, Dr. Silver testified that if she continued to be delusional, which was very likely because her illness was chronic, "some problems" similar to those in the past would recur. He did testify, however, that her illness was mild and did not disrupt her entire life, but allowed her "to function largely in society without any problems" and enabled her to work.

5. Dorland's Illustrated Medical Dictionary, *supra* at 1350, defines "schizophrenia" as "dementia praecox" and defines "dementia praecox" as a "term for a large group of psychoses of pyschogenic origin * * *. The chief characteristics are disorientation, loss of contact with reality, splitting of the personality (schizophrenia, Blueler). The types include the simple and the paranoid * * *." *Id.* at 395. "Paranoia" is defined as "[a] chronic, slowly progressive mental disorder * * * characterized by the development of ambitions or suspicions into systematized delusions of persecution and grandeur which are built up in a logical form * * *." *Id.* at 1098.

On cross-examination, the psychiatrist was questioned about the harm that might result if the mother and children were reunited. He testified that although the mother would not be abusive, her chronic illness would probably cause her delusions to recur, subjecting the children to the same kind of stress that had existed in the past. Doctor Silver explained that this prior "unnecessary stress" occurred when Mrs. Thomas brought the children to the hospital when nothing was wrong with them. The doctor further testified that although he had not examined the children, the record indicated that the stress had not harmed them to such an extent that they required medical or psychiatric attention. He did state, however, that the children required other "treatment," which consisted of placing them in foster care. Doctor Silver also stated that the children had suffered adverse effects from being subjected to an unpleasant experience, although he did not specify the nature of these effects. Finally, the psychiatrist recommended that the mother and her children be closely monitored if they were reunited.

In rendering his opinion, the Family Court justice reviewed the record and found no evidence of child abuse but did find evidence of neglect and dependency. One basis for the justice's findings was the physician's battered and/or abused child report as a result of which the children were initially placed in the protective custody of St. Joseph Hospital. The judge noted that although the physician reported no physical abuse, he found that the mother appeared "psychotic and unable to manage child care." In reviewing the testimony of both department caseworkers, the justice determined that no statements were made concerning any physical abuse of the children, but the entire testimony referred to Mrs. Thomas's "so called problems." The justice found that these problems concerned the mother's fears for the health and safety of her children and that these fears continued after the children were placed in foster care. He further found that as a result of her fears the mother repeatedly brought her children to the hospital for physical examinations when no physical problems existed. Similarly, he noted that Mrs. Thomas's concerns for her children's safety in the foster home were never justified. The justice determined, moreover, that caseworker Gartner observed a much closer relationship between the mother and Lee than between the mother and Colletta.

The trial justice placed strong emphasis on the findings of Dr. Silver. He noted that Dr. Silver diagnosed the mother as suffering from a paranoid-type, schizophrenic illness that manifested itself in her delusions about her children's safety. The justice emphasized the psychiatrist's testimony on cross-examination that taking the children to the hospital when nothing was wrong with them was harmful. The justice further stressed the psychiatrist's testimony that the mother's delusions probably would continue.

In conclusion, the trial justice found that Mrs. Thomas suffered from a mental illness that was harmful to the children. He further found that all the evidence, including Dr. Silver's testimony, showed that reunification of the mother and children would "affect their physical and mental well-being." Therefore, the justice held that the children were neglected and dependent; and he committed them to the care, custody, and control of the department until further order of the court. The trial justice also ordered the department to provide a plan for the reunification of the mother and children and ordered the mother to apply for and continue treatment with Dr. Silver. The case was continued for review.

In her appeal, Mrs. Thomas asserts that the trial justice erred in finding the children dependent and neglected. She contends that the department failed to meet its burden under § 14–1–3(H) requiring proof by clear and convincing evidence that the children were suffering, or were likely to suffer, physical and/or emotional harm from the mother's conduct. Mrs. Thomas argues that the court's finding of the single factor of mental illness was insufficient to support its holding of dependency and neglect, and that the justice made no finding

that the mother's conduct would be harmful to her children. The department asserts that it met its burden of proof and that the Family Court justice did not rely solely on the factor of the mother's mental illness in rendering his decision.

■ As a threshold observation, we note that the findings of a trial justice sitting without a jury are entitled to great weight and will not be disturbed on appeal unless they are clearly wrong or unless the justice misconceived or overlooked material evidence. *In re Joseph*, R.I., 420 A.2d 85 (1980); *In re LaFreniere*, R.I., 420 A.2d 82 (1980). For the following reasons, we hold that the trial justice made no clearly erroneous findings and did not overlook or misconceive material evidence.

■ We have previously held that in neglect, dependency, or abuse proceedings, courts must follow a three-dimensional approach, giving proper regard to the interests of the state, the parents, and the children. *In re Lester*, R.I., 417 A.2d 877, 880 (1980). In addition, we recognized that although the rights of the parents are a "most essential consideration" in such proceedings, the children's best interests and welfare outweigh all other considerations. *Id.*

Moreover, in *In re Jonathan*, R.I., 415 A.2d 1036, 1039 (1980), we stated the following.

"We hold that the trial justice in a neglect and/or dependency proceeding be required at least to articulate his findings in regard to the emotional and physical welfare of the child in light of the parent's alleged misconduct. Unless the state can prove by clear and convincing evidence that a child is actually suffering or is likely to suffer physical and/or emotional harm, there is no reason to disturb the basic security of a family relationship. [Citations omitted.]

"We therefore hold that G.L.1956 (1969 Reenactment) § 14–1–3(H), requires a finding that the allegedly offending conditions or conduct is, or is likely to become harmful to the best interest of the child before the child may be found to be dependent and/or neglected."

■ Applying the above principles to the case at bar, we find that the trial justice's findings of neglect and dependency were supported by clear and convincing evidence. A review of the record indicates that the children suffered, and are likely to suffer, emotional harm from the mother's behavior. Although the evidence showed no physical abuse, Dr. Silver's testimony clearly indicated that the children suffered "unnecessary stress" when the mother continually brought them to the hospital for physical examinations when they were not ill. Moreover, the doctor indicated that the children had sustained adverse effects from the mother's conduct. The psychiatrist's testimony shows, furthermore, that the mother's behavior resulted from her schizophrenic illness which induced delusions about her children's welfare. Moreover, he testified that the mother's behavior very likely would recur and subject the children to future stress.

The caseworkers' testimony supported the fact that Mrs. Thomas suffered from delusions and that she exhibited the unusual behavior of repeatedly taking her children to the hospital. Moreover, the battered child report from St. Joseph Hospital and the psychiatric examination at Butler Hospital both indicated that Mrs. Thomas appeared psychotic; and the report further indicated that the mother appeared unable to care for her children. The record also showed that the mother displayed strange sexual conduct toward her son, which consisted of constantly fondling and kissing him, and almost completely ignored her daughter.

In view of the foregoing, we believe that the decision of the trial justice in finding the children neglected and dependent was amply supported by the record. The evidence clearly indicates that the mother suffers from a mental illness. The record moreover shows that the mother's conduct arising from her illness was, or is likely to become, harmful to the children's best interests, especially their emotional welfare.

898

See *In re Jonathan, supra.* In addition, the trial justice gave proper regard to the rights of the mother by ordering a plan for the eventual reunification of her and her children.

For the reasons given, the mother's appeal is denied and dismissed, the decision of the Family Court is affirmed, and the case is remanded to the Family Court for further proceedings.

WEISBERGER, Justice, concurring.

I agree fully with both the reasoning and the result set forth in the majority opinion. In light of the order of the trial justice that the department formulate a plan for the eventual reunion of the mother and her child, I should like to add the following comments.

The undisputed facts in this case establish that Mrs. Thomas has been diagnosed as suffering from paranoid schizophrenia. This is a psychosis of a most serious nature. Among the effects of this grave mental disorder are delusions and a disjointed thought process. This illness was described by a qualified psychiatrist as chronic. Although she had been advised that treatment of her psychotic condition was required, she has refused to be admitted to a psychiatric facility or to receive outpatient treatment on a regular basis.

As a consequence, in spite of the euphemisms which Mrs. Thomas's counsel has employed in referring to her "handicap," there is a serious question concerning whether Mrs. Thomas is now or will in the future be fit to be the custodian of small children. Although a slight handicap, including non-serious mental or emotional problems, may not affect the fitness and competence of a parent to exercise custody of a child, a serious mental illness is obviously an important factor to be taken into consideration in a custody or dependency decision. *Bowler v. Bowler*, 355 Mich. 686, 96 N.W.2d 129 (1959); *Gardner v. Gardner*, 239 Mich. 306, 214 N.W. 133 (1927); *see* annot. 74 A.L.R.2d 1073 (1960). In *Bowler*, medical testimony emphasized the " 'devastating' effect that exposure of growing children to such an afflicted parent could have on them, not only in the present but in the unpredictable future * * *." *Bowler v. Bowler*, 355 Mich. at 690, 96 N.W.2d at 131. It is worthy of note that Mrs. Bowler also was diagnosed as suffering from "schizophrenia, paranoid type, chronic, active." In order for the court to find that a child or children are likely to suffer physical and/or emotional harm, it is not necessary that there has been a positive showing of demonstrable physical injury in the past. *In re Welfare of Kidd*, 261 N.W.2d 833, 836 (Minn.1978). "The state's role in protecting children may properly be preventive of harm as well as remedial." *In re Lester*, R.I., 417 A.2d 877, 881 (1980); *Custody of a Minor (No. 1)*, 377 Mass. 876, 883, 389 N.E.2d 68, 73 (1979); *In re Welfare of Yetter*, 22 Wash.App. 304, 308, 589 P.2d 815, 817 (1979). These principles should be considered in determining the eventual fitness of Mrs. Thomas as a custodian of her minor children.