**In re JAMES A.**

**No. 85–186–Appeal.**

Supreme Court of Rhode Island.

March 18, 1986.

Laureen Q. D'Ambra, Dept. of Children & Their Families, for plaintiff.

Nicholas L. Colangelo, Providence, for defendant.

## OPINION

SHEA, Justice.

This matter came before the Supreme Court on appeal from a decree of the Family Court declaring Aaron, aged 5, and Keith, aged 3,[1] dependent children. The trial justice found that the children had been sexually abused by their father in violation of G.L.1956 (1984 Reenactment) § 40-11-2 and G.L.1956 (1981 Reenactment) § 14-1-11. He committed them to the care, custody, and control of the Department of Children and Their Families (DCF). The father alleges that he was denied due process of law during the hearing and that the trial justice's findings were not supported by competent evidence. We affirm.

In March of 1984 the children had been voluntarily placed by their mother with Children's Friend and Service (CFS), a private child-placement agency. This voluntary placement was made because of her separation from her husband and the emotional difficulties she was experiencing. During the months that followed, the children were placed in several foster-care homes.

A social worker employed by CFS was assigned on March 12, 1984, as a caseworker on the children's case. He continued in that capacity until the children were declared dependent by the Family Court in August of 1984. His instructions were to arrange for the foster placement of the children and to establish a counseling program for the parents. The children were placed in their first foster placement for a short time. Aaron was moved to his present foster placement on April 13, 1984. Keith joined Aaron on July 13, 1984.

In June of 1984 the foster parents reported their suspicion that Aaron had been

---

1. The names used are aliases to protect the anonymity of the children.

sexually abused. After discussing the matter with his supervisor, the CFS caseworker spoke with the children but was unable to get either of them to confirm the foster parent's suspicions. Later in the month DCF received an anonymous report that Aaron had been neglected and physically abused by his foster parents. The caller alleged that both foster parents had been abusing alcohol and that, in addition, the foster mother had been abusing Valium. In response DCF sent a field investigator to the foster home to determine if there was any merit to the complaint. After examining Aaron and speaking with each of the foster parents separately, the field investigator concluded that the anonymous complaint was unfounded.

In August of 1984, the CFS caseworker filed a complaint with DCF, alleging that the children had been sexually abused by their natural father prior to being placed in foster care. The caseworker made this complaint relying on observations and reports of the children's conduct, which involved aberrant sexual conduct inconsistent with their ages, as well as statements they made in their foster home. An investigation by DCF substantiating these allegations included statements made by the children to a DCF investigator, Cranston police officers, and physicians at Rhode Island Hospital. An ex parte order was entered removing the children legally from the custody of both parents, thereby preventing them from taking custody of their children by revoking their voluntary commitment.

The placement hearing commenced on October 17, 1984. During the hearing expert testimony was presented. This testimony concerned the possibility that these children had suffered sexual abuse. A third-year pediatric resident at Rhode Island Hospital, who examined both Aaron and Keith on August 8, 1984, testified that he found no evidence of physical abuse. Nevertheless, the medical history offered by the two boys persuaded him to admit

them for observation and full evaluation by the hospital's child-abuse team.

Doctor Edward Collins, director of Pediatric Primary Care and the Multi-Disciplinary Child Abuse Team at Rhode Island Hospital, testified as an expert in pediatrics and child abuse. Doctor Collins stated that the medical evaluation in alleged abuse cases has two coequal parts. First, there is the history, in which the physician elicits information from the child, the foster parents, social workers, and any other persons who might have information about the child's past behavior and present condition. The history is followed by physical and laboratory examinations. Taken together, they form the basis for a medical diagnosis.

Doctor Collins testified that the history of both boys revealed behavior that failed to correspond with their ages. The foster parents noted that the boys seemed fascinated with male genitalia. They had been observed kissing each other's nipples and doing something orally that they described to one of the team members as French kissing. The children revealed to the interviewing physician that they had been subjected to anal intercourse and had been asked by their father and another person to perform fellatio. Doctor Collins concluded that the boys had been sexually molested but acknowledged that there was no physical evidence of sexual abuse. He emphasized that of all of the cases he had been involved with, this one presented the greatest possibility that there had been exposure to sexual molestation. He noted that

"[t]he boy gives detailed histories which remain consistent to several examiners. This should be given great credibility, as children who give such stories have either experienced these acts or have been exposed to intense sexual themes in their environment. There is nothing to indicate that either of these situations has existed in the current foster home * * *."

At trial Keith was not permitted to testify. However, Aaron, after the trial justice held

an in-camera interview and made a determination that he was a competent witness, testified at length about the incidents of sexual and physical abuse by his father. The trial justice stated that he would ask the child any questions submitted by counsel. The attorneys for both parties were present and remained at the interview until the child, in the midst of relating an instance of sexual abuse, began crying. At that point the trial justice cleared the chambers and continued the questioning with only the child and the stenographer present. The trial justice did not allow cross-examination but provided that upon completion of the questioning the stenographic record would be read back for the attorneys, who would be permitted to formulate followup questions for the trial justice to put to the child. Neither party submitted any followup questions.

During the in-camera investigation Aaron credibly testified in graphic detail about the sexual abuse he and his brother suffered and the physical abuse that was inflicted upon them at the hands of his natural father and uncle when they cried or protested. The details of these episodes are extremely disturbing and for our purposes need not be elaborated upon here.

At the end of the interview the child was told that his natural father was outside. The child asked to see the father so that he could find out if he had brought him a certain type of card. The father, after being informed of his rights by his attorney, agreed to meet with the child in the presence of the judge. During this meeting the judge asked Aaron if he wanted to go home with his father, but Aaron responded with an emphatic no and said that he loved his foster parents. At that point the judge asked Aaron if this was the man who had physically and sexually abused him, to which question, Aaron answered in the affirmative. The father attempted to dissuade Aaron from this assertion, but Aaron

did not waiver and again answered affirmatively when asked if his natural father physically and sexually abused him. At that point the meeting was terminated. The father's counsel made timely objections to the child's in-camera testimony.

The natural father was called as a witness by DCF under the adverse witness statute. He asserted his Fifth Amendment privilege not to testify in response to all questions. The questioning by DCF mainly concerned the actual acts of sexual and physical abuse by the natural father and the uncle that the children had endured.

During the hearing, both DCF and the father sought rulings on the relevancy and confidentiality of subpoenaed materials from CFS. The trial justice reviewed this material in camera and determined that part of it was not relevant and that it was protected under the confidentiality provisions of the Confidentiality of Health Care Information Act, G.L.1956 (1976 Reenactment) chapter 37.3 of title 5. The trial justice ruled that other materials were relevant and did not fall within the scope of the confidentiality act. The trial justice ordered the confidential information sealed. The father made timely objection to the sealing of this material.

At the close of all the evidence the trial justice rendered a decision in which he found that the father had sexually abused the two boys. This determination was based on the medical evidence presented, the in-camera testimony of Aaron, and the testimony of the various social service employees. The trial justice also considered inferences of culpability that could reasonably be drawn from the father's assertion of his Fifth Amendment privilege against self-incrimination in the civil context. *Pulawski v. Pulawski,* 463 A.2d 151, 156 (R.I. 1983).

The trial justice specifically found that a sexually abused child may be found to be abused under the provisions of §§ 40–11–1 and 2, despite a lack of physical evidence of

harm or even a means of determining that there has been emotional harm. Having found that the father sexually abused these children he removed them from the father's custody and foreclosed all visitations until further order of the court. The trial justice placed control of the children's educational needs with DCF. He also ordered (1) that the father participate in a sexual-abuse treatment program and (2) that in the event he was to fail to participate in such a program within the next six months, DCF was ordered to file termination-of-parental-rights proceedings against him.

On appeal the father argues that the court-prescribed procedure of interviewing the minor child, without affording him the right of confrontation, failed to accord him his constitutional right to due process of the law. He also claims that the trial justice erred in determining that certain records were not relevant as well as being privileged under the Confidentiality of Health Care Information Act. Chapter 37.3 of title 5.

■ The Sixth Amendment to the United States Constitution does extend the right of confrontation to individuals subject to criminal prosecutions. However, contrary to the father's assertion, no constitutional right to confrontation or cross-examination attaches in noncriminal proceedings. *See, e.g., Gordon v. Crouchley,* 554 F.Supp. 796 (D.R.I.1982) (Sixth Amendment right to counsel not extended to civil actions involving family disputes). Therefore, the question before us is not whether the father is guaranteed a constitutional right of confrontation or cross-examination in the civil context but rather whether due process in this case necessitates the father's being afforded the right to cross-examination. This is a determination that must be made in light of the particular facts and circumstances of the particular case.

The father argues that the right to bear and raise children is a fundamental right, and as such, any interference with that right will be justified only upon a showing of a compelling state interest. This court has recognized the essential rights involved in the "undisturbed privacy in determining [the family's] internal arrangements," but we have noted that "[t]hese rights have not been found by the Supreme Court to be unlimited." *In re Lester,* 417 A.2d 877, 879–80 (R.I.1980). The Supreme Court has stated that the rights of parents to determine what is in the best interest of their children may be subject to state intervention when the physical or mental health of the children is drawn into question. *Id.* We have declined to apply strict judicial scrutiny in child neglect, dependency, or abuse situations. We have adopted a three-dimensional approach that gives due consideration to the interests of the parents, the children, and the state. *Id.* "In child-abuse and related custody proceedings, we have long espoused the position that the rights of parents are a most essential consideration, but we further recognize that the best interests and welfare of the child outweigh all other considerations." *Id.* at 880.

In this case the father suggests that the right to confront and cross-examine the child was essential to afford him due process of law. What would constitute due process for the father in this case must be determined by weighing the competing interests of the father, his children, and the state. It is well established that

" [t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation and firmly established that what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' " *Stanley v. Illinois,* 405 U.S. 645, 650–51, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972).

In the first instance the trial justice must determine in his discretion what process is due in the particular circumstances, taking into consideration the particular needs of the interested parties. In the final instance we shall review the determinations made by the trial justice and shall reverse on appeal only when an abuse of discretion is shown.

■ In this case Aaron, as the victim of acts of sexual and physical abuse, had direct knowledge of the facts surrounding the incidents; therefore, his testimony was invaluable in determining the culpability of the father. However, owing to his tender years and the nature of the acts to which he was subjected, the trial justice decided that a routine, in-court examination of the child could result in severe psychological trauma. Accordingly, he ordered the in-camera interview of the child. The best interest of the child as weighed against the interests of the parent and the state certainly supports use of this type of procedure and was within the discretion of the trial justice.

The procedure that the trial justice followed during the in-camera interview afforded the father due process of law. Prior to the interview he was permitted to submit questions to the trial justice that, in his discretion, he could ask the child. Counsel for both sides, as well as a stenographer, were permitted to attend the interview, and the attorneys were asked to leave only when it was obvious that the child had become emotional. Following the interview, the record was read back in open court, and counsel was permitted to submit followup questions, which they refrained from doing. Moreover, the father was allowed to talk with the child in chambers with the stenographer and the trial justice present.[2] These procedures adequately protected the due-process rights of the fa-

ther while protecting the interests of the state and the child.

■ It is clear that the trial justice's findings were supported by competent evidence. He did not rely solely upon the in-camera interview in finding the children abused and neglected. He also considered the expert testimony, the reasonable inferences flowing from the father's assertion of his Fifth Amendment privilege, and the other testimony in the hearing. We are of the opinion that the decision of the trial justice was fully supported by the evidence.

■ The father also asserted that the trial justice erred in determining that disclosure of certain records was prohibited by the Confidentiality of Health Care Information Act, chapter 37.3 of title 5, and that those, so prohibited, were not relevant. This court recently in *Bartlett v. Danti*, 503 A.2d 515 (1986) held the Confidentiality of Health Care Information Act unconstitutional as being violative of both the separation of powers mandated by article 3 of the Rhode Island Constitution and by denying litigants the right to justice as is mandated by article 1, section 5, of the Rhode Island Constitution. Once a statute is ruled unconstitutional, it is so for all time, and as such, the finding of unconstitutionality relates back to pending litigation. Therefore, the Confidentiality of Health Care Information Act could not bar the disclosure of the records that the father sought.

■ In ruling on the accessibility of this information, however, the trial justice, after an in-camera inspection of the requested material, specifically found that this information was not relevant. We have held that the question of relevancy is within the sound discretion of the trial justice. *Thomas v. Amway Corp.*, 488 A.2d 716 (R.I. 1985). Such a determination made by a

---

**2.** We are not holding that in all cases the adult, whether he or she is the parent must be allowed to confront or question the child as was done in

this case. The trial justice must, in each case, exercise his discretion and do what is required to balance the conflicting rights of all parties.

trial justice will be disturbed on appeal only when an abuse of discretion is shown. *Aiello Construction, Inc. v. Nationwide Tractor Trailer Training and Placement Corp.*, 122 R.I. 861, 413 A.2d 85 (1980). An objecting party has the burden of demonstrating that the proposed evidence was material and that its exclusion was prejudicial to him. *Id.* In this case the father suggests that this determination by the trial justice may have interfered with his ability to cross-examine witnesses adequately. There is no suggestion regarding how the production of the material would have aided the father in cross-examination or how it would have affected the decision of the court. The father, therefore, has failed to demonstrate an abuse of discretion.

For these reasons, the father's appeal is denied and dismissed, the action of the Family Court is affirmed, and the papers of the case are remanded to the Family Court.