**STATE**

v.

**Jorge MORA.**

**No. 91–16 C.A.**

Supreme Court of Rhode Island.

Jan. 11, 1993.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine Gibran, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

MURRAY, Justice.

This case comes before us on appeal by the defendant, Jorge Mora, from his conviction of first-degree sexual assault. The defendant argues that the trial justice erred in both admitting an audio-tape recording of the assault and allowing a subsequent demonstration using that recording. The defendant also contends that his rights to a fair trial and to testify on his own behalf were so impaired by difficulties arising in the Spanish–English translation that the trial justice erred in failing to grant his motion for a mistrial. We reject the defendant's arguments and affirm.

The testimony adduced at trial concerning the alleged criminal assault that occurred on August 9–10, 1988, is frequently contradictory. For purposes of depicting the general sequence of events that evening, we shall summarize the victim's version of the facts. The victim, Karen LaFleur (LaFleur), testified that on August 9 she was employed as a cocktail waitress at Wolfie's, a topless bar formerly located in Providence. Although she had already finished her shift on that date, she returned to Wolfie's at approximately 10:30 p.m. that evening to visit a friend who was dancing there until 1 a.m., when the bar closed. LaFleur consumed approximately three drinks consisting of vodka and cranberry juice while waiting at the bar.

During the course of the evening LaFleur made arrangements with another dancer known as Sadia to bring Sadia home with her after closing whereupon they would ingest cocaine. Since LaFleur, however, did not possess any cocaine herself, Sadia arranged for her to purchase some from two men present at the bar, Joshua Jorge (Jorge) and defendant, Jorge Mora (Mora). Prior to the transaction, LaFleur did not know either of the two men.

While the victim, defendant, and Jorge were in the midst of this cocaine transaction, five or six uniformed Providence police officers entered Wolfie's. Immediately thereafter LaFleur and the two men left the premises in Jorge's Honda Civic and proceeded to drive around for a while before they were due to return to Wolfie's to retrieve Sadia. At this time all three consumed cocaine and beers provided by Jorge. They returned to Wolfie's later that evening and found that the bar was closed and Sadia had already left. In search of her friend LaFleur called Sadia's home from a pay phone near the parking lot adjacent to Wolfie's. There was no answer at that time, but LaFleur decided she would phone back in a short while to check on her again. She then got into the Honda for the second time with Jorge, who was driving, and defendant, who was in the rear seat.

The victim testified that throughout this sequence of events she engaged in continual conversation with Jorge. However, LaFleur never conversed with defendant because of his inability to speak English. She also stated that defendant and Jorge occasionally spoke in what she believed to be Spanish during their travels that evening.

Still in search of her friend, LaFleur requested that they find another pay phone from which she would again try to call. When she did place this call, Sadia's boyfriend answered the telephone and informed LaFleur that Sadia was already asleep. LaFleur decided it was also time

for her to go home. Instead, however, Jorge drove to an area behind the C.A. Brown Company building located at 315 Wellington Avenue in Cranston.

While parked in this industrial area, the victim, defendant, and Jorge each ingested more cocaine. At some point all three got out of the car. The victim testified that at this time she observed defendant and Jorge arguing, although she could not identify the subject matter because they were speaking in Spanish. When Jorge finally stepped away from defendant and approached the victim, he informed her that defendant wanted to have sexual relations with her. With the ostensible intention of extinguishing defendant's desires, Jorge suggested that the victim kiss Jorge and make it appear as though she was already romantically involved with him. LaFleur initially complied with this suggestion but thereafter pulled herself away from Jorge because she believed his suggestion was driven only by self-serving motives and not solely to have an effect on defendant.

Eventually they all returned to the car and assumed the same positions in which they were seated earlier. While the car was still parked, defendant crawled between the bucket seats from the back seat to the passenger seat where the victim was sitting. The victim testified that he attempted to kiss her and put his hands up under her skirt while she struggled to get him off her. In an effort to get away from defendant, the victim opened the passenger door and fell out of the car to the ground. The defendant fell out as well and landed on top of the victim, who continued to struggle and scream.

Jorge initially did not intervene, although he did get out of the car once the victim and defendant were on the ground outside the car. Jorge proceeded to the back of his car, opened the hatchback, removed a large canvas dropcloth, and threw it to defendant, who in turn placed it over LaFleur's head. In the course of the subsequent struggle, defendant pulled the victim's underwear off and both men pinned her to the ground. The victim testified that while Jorge sat on her chest with his knees on her arms and one hand over her mouth, defendant took down his pants and inserted his penis into her vagina. LaFleur continued to scream, although her voice was effectively muffled by Jorge's hand.

The sexual assault continued for a couple of minutes, after which time defendant stood up, zipped his pants, and returned to the car. While Jorge was still sitting on the victim's chest, a Cranston police cruiser arrived at the scene. The officer driving that vehicle testified that after she turned on her alley spotlight, she saw Jorge get off the victim and run to the driver's side of the Honda Civic. This officer also testified that the victim was dirty, bruised, hysterical, and not wearing underpants. Both defendant and Jorge were arrested on the scene.

A grand jury indicted defendant on November 9, 1988, for first-degree sexual assault.[1] The case came up for trial in January 1990. On January 29, 1990, after eight days of testimony, a jury found Mora guilty of first-degree sexual assault. The defendant filed a motion for a new trial on February 6, 1990, contending that (1) the verdict was contrary to the clear weight of the evidence and (2) defendant was substantially prejudiced and deprived of a fair trial because the court-appointed interpreter used during the direct and the cross-examinations of defendant had inaccurately interpreted defendant's testimony, thereby causing the jury to assess defendant's demeanor and credibility unfairly. This motion was denied by the trial justice on February 12, 1990, and defendant was thereafter sentenced to forty years with twenty-eight years to serve. The defendant filed a timely appeal on April 27, 1990.

The defendant's appeal raises two issues. First, defendant asserts that the trial jus-

---

1. Jorge was also indicted by the same grand jury on two counts: aiding and abetting in the sexual assault committed by defendant and assault with intent to commit sexual assault. The latter count against Jorge was dismissed in accordance with Super. R.Crim. P. 48(a). On October 18, 1989, Jorge pleaded guilty to the aiding-and-abetting charge and was sentenced on December 8, 1989, to ten years at the Adult Correctional Institutions with eighteen months to serve.

tice abused her discretion and committed reversible error in allowing the jury to hear an audio-tape recording of the assault and the victim's commentary on the same. Second, defendant argues that he was denied a fair trial because he could not testify effectively on his own behalf because of the inaccurate translations between Spanish and English during defendant's testimony. We shall address each issue in turn.

I

## USE OF DEMONSTRATIVE EVIDENCE

The creation of the audio tape at issue was incidental to the placement of a security system installed in the C.A. Brown Company. As part of this Sonitrol security system, five microphones were placed in various parts of the building to monitor any unusual sounds that might occur in the middle of the night. If a noise rises above a preset threshold level, then the sounds are transmitted live to a monitoring console at the Sonitrol headquarters where a Sonitrol employee is on duty throughout the night.

At approximately 2:30 a.m. on August 10, 1988, Michael Savaria (Savaria) was on duty at the Providence headquarters of Sonitrol. He testified that in the course of monitoring approximately 3700 accounts with Sonitrol, he heard a woman in trouble in or near the C.A. Brown Company in Cranston. He immediately activated a tape machine at Sonitrol, which picked up the noises from the incident as they were transmitted from a microphone installed at the C.A. Brown building, and called the Cranston police. Savaria also testified that after roughly three minutes, during which time he heard more sounds of a woman struggling, he heard a car approaching the area from which the noises were emanating. The tape recorder was deactivated and rewound when Savaria heard what he believed to be police officers on the scene.

The original cassette tape was sent to the Federal Bureau of Investigation (FBI)

where it was subject to an enhancement procedure, the purpose of which was to maximize the intelligibility of the sounds and/or voices on the tape. This enhanced version of the Sonitrol audio tape was played to the court, including the jury, through individual headphones. Later, during direct examination of the victim, the enhanced version was played for the jury a second time with prosecutorial interruptions permitted at five different points. Each time the tape was stopped, the victim was asked what was occurring at that particular time.

The defendant contends that the enhanced version of the tape was irrelevant and prejudicial and should not have been admitted into evidence. Additionally defendant argues that it was further error for the trial justice to allow the tape to be used a second time to conduct a demonstration during the victim's testimony. In support of these assertions, defendant suggests on appeal that the tapes are virtually useless because defendant has never contested the elements of force and coercion used during the sexual assault and because the only issue is the identity of the perpetrator, which is not evidenced by the audio tape. We do not agree with defendant's assessment of the usefulness and relevancy of the tapes.

■ This court previously has acknowledged that "sound recordings, if related to otherwise competent evidence, are admissible provid[ed] a proper foundation is laid for their admission." *In re Deborah M.,* 544 A.2d 572, 575 (R.I.1988) (quoting *State v. Gonya,* 107 R.I. 594, 596, 268 A.2d 729, 730 (1970)). It is evident from our reading of the record, which includes testimony from two Sonitrol employees and a special agent assigned to the FBI's Electronic Surveillance Unit, that a proper foundation was laid before the jury was presented with the enhanced version of the Sonitrol tape. We turn then to the relevancy of the tapes.

■ The question of relevancy, as governed by Rules 401 through 403 of the Rhode Island Rules of Evidence, is within

the sound discretion of the trial justice. *In re James A.*, 505 A.2d 1386, 1391 (R.I.1986) (citing *Thomas v. Amway Corp.*, 488 A.2d 716, 720 (R.I.1985)). Of particular importance in this case is Rule 403, which allows relevant evidence to be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or by considerations of needless presentation of cumulative evidence. Nonetheless, a determination of relevancy made by a trial justice will not be disturbed on appeal unless an abuse of discretion is shown. 505 A.2d at 1391–92. *See also State v. Neri*, 593 A.2d 953, 956 (R.I.1991); *State v. Gelinas*, 417 A.2d 1381, 1386 (R.I.1980); *Aiello Construction, Inc. v. Nationwide Tractor Trailer Training and Placement Corp.*, 122 R.I. 861, 868, 413 A.2d 85, 89 (1980); *Gaglione v. Cardi*, 120 R.I. 534, 538, 388 A.2d 361, 363 (1978).

■ The defendant maintains that the tapes are irrelevant because the use of force and coercion is undisputed in this case. We find this argument to be without merit. When the state prosecutes a defendant, it carries the burden of proving every element necessary to the charge beyond a reasonable doubt, even if some of those elements may not be disputed. Because of this burden, the state has the right to establish the existence of those elements as it deems just. *See State v. Lionberg*, 533 A.2d 1172, 1180 (R.I.1987). In the case at bar, the charge of first-degree sexual assault requires a finding that the accused used force or coercion. General Laws 1956 (1981 Reenactment) § 11–37–2(B), as amended by P.L.1987, ch. 238, § 1. Because it is incumbent upon the state to prove this element beyond a reasonable doubt, we find that the use of the audio tape offered probative evidence of such force and coercion.

■ We believe that the trial justice did not abuse her discretion in admitting the enhanced version of the Sonitrol tape into evidence. Although what is prejudicial cannot be determined by a fixed formula, *see State v. Pugliese*, 117 R.I. 21, 26, 362 A.2d 124, 126 (1976), we are of the opinion that the introduction of the tape did not cause defendant to suffer any undue prejudice in light of the factual context in which the tape was admitted into evidence. Upon reviewing the record, we find that the probative value offered by the tape outweighed any prejudice suffered by defendant as it offered corroborative evidence that establishes the elements necessary to the state's case.

■ In regard to the use of the audio tape during the state's direct examination of the victim, defendant asserts that this demonstration was a needless presentation of cumulative evidence. According to defendant, the jurors were capable of interpreting for themselves the sounds on the tape, but the state pursued this form of demonstration to evoke the jury's sympathies for the victim. We disagree.

The probative value offered by this narrative exercise was to determine where each of the parties was and what each was doing at the time the tape was paused. Although the victim had already described the attack and her lack of consent on direct examination, the audiotape presentation served the same purpose as any other form of demonstrative evidence, including a diagram, a photograph, or a map. Indeed the trial justice likened this demonstration to other such forms wherein it is appropriate to have a witness identify certain items on a map or certain objects in a photograph. We therefore find that the trial justice did not abuse her discretion in permitting this relevant, although somewhat disturbing, demonstrative evidence to be presented to the jury.

## II

### COURT-APPOINTED INTERPRETERS

The defendant next argues that he was denied his rights to a fair trial and to testify effectively on his own behalf because his testimony was seriously impaired by the many deficiencies in the Spanish–English translation. The defendant asserts that the trial justice erred in failing to grant his motion for a mistrial, which was presented to the court during the lunch recess of the second day of defendant's

testimony as well as during the state's closing argument. We are not persuaded that the court-appointed interpreter's performance was so woefully inadequate and inaccurate as to cause defendant to receive a fundamentally unfair trial.

 Rule 28(b) of the Superior Court Rules of Criminal Procedure allows the trial justice to appoint an interpreter of his or her own selection. The selection itself rests in the sound discretion of the trial justice as an incident to the proper administration of the trial. *Erba v. Erba Bros., Inc.*, 77 R.I. 75, 81, 73 A.2d 697, 701 (1950). We shall not interfere with the exercise of such discretion unless it is shown that the trial justice abused his or her discretion in appointing an interpreter. *Id.*

██ The defendant's inability to speak English caused defense counsel to move the court for appointment of an interpreter. That motion was granted on June 20, 1989, and thereafter Charlene Patenaude (Patenaude) served as a translator for the defense team. During the time leading up to the trial, Patenaude became both familiar with the names of the persons involved and accustomed to defendant's Nicaraguan dialect. The court noted, however, that Patenaude's involvement in defendant's case could mislead the jurors into believing that defendant's testimony on the stand was being translated by a friend rather than by a professional interpreter. To eliminate the risk that defendant's testimony be discounted in any way, the trial justice appointed Inge Feldman (Feldman) as the official court interpreter upon Patenaude's recommendation. Patenaude remained at defense counsel's table to keep defendant abreast of what was being said in the course of the trial.

The defendant enumerates each occasion in which Feldman had difficulty either understanding an answer defendant had given or remembering a lengthy question prof-

fered by counsel. The defendant also presented to the trial justice a list of discrepancies between defendant's answer in Spanish and Feldman's translation into English, as had been noted by Patenaude in the course of defendant's testimony. Furthermore, defendant argues that Feldman's inability to keep up with his testimony altered the course of the question-and-answer exercise and therefore caused defendant to appear distraught and evasive as a witness. The defendant specifically alludes to the fact that defendant was not permitted to engage in long narratives and that other lengthy answers had to be split into two parts because the interpreter could not remember whole answers all at once. We do not agree that such modifications in the art of trial advocacy have resulted in a fundamentally unfair trial for this defendant.

Our review of the record leads us to believe that the interpreter requested that questions be framed to invite only brief answers and that defendant repeat his answers so she could translate defendant's answers accurately. Furthermore, we are of the opinion that the trial justice's instructions to counsel and defendant to limit the length of answers were in the interest of providing defendant with the ability to testify effectively on his own behalf through an accurate translation process. We find that the trial justice properly exercised her discretion in allowing Feldman to continue to serve as the court-appointed interpreter,[2] and therefore we shall not interfere with the trial justice's choice in the absence of an abuse of her discretion. *See Erba*, 77 R.I. at 81, 73 A.2d at 701.

 During his second motion for a mistrial, the defendant argued that the state's closing arguments improperly attributed the difficulties in the translation process to the defendant's manipulative, untruthful demeanor. When a defendant

---

**2.** Immediately after the lunch break on the second day of defendant's testimony, the trial justice indicated that the court-appointed interpreter could not be present in court for the remainder of that day. The trial justice thereafter suggested that for the balance of cross-examination and the balance of redirect examination Patenaude would serve as the interpreter. Neither party objected to this procedure, and Patenaude ultimately replaced Feldman as the court-appointed interpreter.

claims that alleged prejudicial remarks form the basis of a mistrial, it is within the province of the trial justice to assess the prejudicial impact of such statements. *State v. Padula,* 551 A.2d 687, 691 (R.I. 1988) (citing *State v. Brown,* 522 A.2d 208, 210 (R.I.1987)); *State v. Marrapese,* 116 R.I. 1, 7, 351 A.2d 95, 98 (1976). A thorough examination of the trial transcript reveals that the trial justice weighed the prosecutor's statements in the context of the defendant's entire direct and cross-examinations and determined that any prejudice caused by such comments would be addressed in her instructions to the jury. *See State v. McDonald,* 602 A.2d 923, 927 (R.I.1992). During her charge to the jury the trial justice did allude to the use of the court-appointed interpreter and instructed the jurors not to use certain errors in the translation as evidence that the defendant was lying. Consequently we find that the trial justice did not abuse her discretion, nor was she clearly wrong in denying the defendant's motion for a mistrial. *Id.*

Accordingly the defendant's appeal is denied and dismissed. The judgment of the Superior Court is affirmed.