In re CRYSTAL, JOSHUA, AND JACQUELINE A.

No. 81–5–Appeal.

Supreme Court of Rhode Island.

Aug. 4, 1982.

Thomas M. Bohan, Legal Counsel, Dept. for Children and Their Families, Providence, for petitioner-appellee.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., Janice M. Weisfeld, Asst. Public Defender, for respondent-appellant.

## OPINION

BEVILACQUA, Chief Justice.

This is an appeal by Samara, the mother of three minor children, Crystal, Joshua, and Jacqueline. Samara appeals a Family Court decree entered July 24, 1980, which, pursuant to G.L.1956 (1969 Reenactment) § 14-1-32, as amended by P.L.1976, ch. 292, § 1, awards care, custody, and control of the children to the Department of Children and Their Families (DCF).

On March 12, 1976, the DCF filed a petition in the Family Court pursuant to § 14-1-11, as amended by P.L.1977, ch. 67, § 1, alleging that Crystal was a dependent and neglected child. The DCF subsequently filed similar petitions on behalf of Joshua and Jacqueline. The Family Court issued an ex parte order removing the children from their mother and placing them in the custody and care of the DCF pending a hearing on the petitions. After holding such a hearing, the trial justice found that on the basis of the evidence presented, the children were dependent as defined in § 14-1-3(H).

A review of the record of the hearing discloses the following evidence and testimony. Crystal was removed from her mother's home in 1976, when she was approximately one month old. Joshua was fourteen months old when he was removed from the home in 1978. He was returned to his mother's care and custody but both he and Jacqueline were taken away in 1979. At that time, Joshua was approximately two years old and Jacqueline was seven weeks old. During the time the children lived with their mother, their grandfather also lived with them and helped care for them. The record reveals that they were living in a cluttered apartment, receiving electricity in their living quarters through an extension cord running from an upstairs apartment, and using a gas stove to supply heat.

Doctor Linda Tartell, a pediatrician, conducted three postnatal examinations of Jacqueline. Doctor Tartell testified that when the baby cried at the initial examination, Samara became angry and placed her fingers over the child's eyelids rather than try to comfort her. She also testified that Samara stated that she fed the baby when Jesus told her to but did not feed her when she cried because she would bite her. After this first examination, Dr. Tartell called the DCF because she was concerned about the

effect of Samara's actions on the child. Doctor Tartell stated that in her opinion Samara could not adequately care for any child less than five years old.

Eugene LaPierre, a social worker employed by the DCF, testified that he had numerous contacts with Samara and her children from March of 1979 to May 18, 1979. As a result of his observations during these visits, he filed the petition to have Joshua and Jacqueline removed from the care and custody of their mother. He testified that during subsequent contacts with Samara at the center, her apartment, and by telephone, she seemed out of touch with reality and insisted that Jesus was the father of one of the children. During the time LaPierre observed Samara with her children, she rarely interacted with them and failed to respond normally to their needs. On one occasion she repeatedly woke Jacqueline, who was trying to nap, in spite of LaPierre's warnings of the harm caused to the child by interruption of her sleep. She also refused to continue feeding the child even though she cried and reached for food, insisting that the child was no longer hungry. LaPierre testified that Samara failed to sterilize used bottles and instead would simply rinse them with tap water before adding formula. He also testified that in Samara's presence Joshua took matches from a table and attempted to strike one and that until LaPierre directed Samara's attention to this, she failed to take the matches away.

Lynn Boissel, a DCF caseworker, testified that she monitored Samara's visits with her daughter Crystal at the center. During her visits between March 16 and September 20, 1977, Samara had very little interaction with Crystal. Samara also refused to provide information about her other children. On one of her visits, when the DCF could not locate Joshua, Ms. Boissel indicated that Samara refused to disclose the whereabouts of the child. Eventually, the DCF determined that Joshua was staying with Frances Waldron, his putative paternal grandmother. The DCF also learned that Mrs. Waldron had kept the boy for fourteen months because she had felt that Samara was not well enough to care for the child.

The DCF submitted medical records from the Johnston Mental Health Clinic, the Institute of Mental Health, and the Providence Mental Health Center indicating that Samara had a history of psychotic disorder. Doctor Patricia Wold, a psychiatrist, testified that she had examined Samara on five occasions between August 13, 1979 and January 1980, and that in her opinion Samara could not adequately care for a minor child. Doctor Wold explained that Samara had undergone an acute schizophrenic episode from August of 1979 to January of 1980 and that although this episode had passed, there was a very great possibility that she would have another psychotic episode that would further disrupt the children's lives.

Donna Manion, a visiting nurse, and Judith Ferris, a psychiatric social worker, testified on behalf of Samara. Ms. Manion stated that having visited Samara's house and observed the children, she believed that the children were receiving adequate care. Ms. Ferris testified that Samara was in touch with reality and coherent in her conversations. Nothing in Samara's conduct indicated to Ms. Ferris that she was a danger to herself or to her children. She concluded from her observations and conversations that Samara could provide for the needs of anyone entrusted in her care. She did admit, however, that Samara had been psychotic.

The trial justice found no evidence of abuse or neglect but determined that the children were dependent. The trial justice noted that the medical testimony and reports concerning Samara's actions, thoughts, and expressions indicated that she had schizophrenic tendencies. The trial justice also noted that testimony throughout the hearing indicated that Samara made incoherent statements: Samara thought she had heard religious figures speak to her and believed that Jesus had fathered her child. She also stated that a neighbor, Maurice Dixon, was actually Adolf Hitler and asked visiting social workers to turn off her gas oven when the oven door was open and the

oven was turned off. The trial justice stressed that at times Samara's incoherency made it difficult to extract necessary information about the children from her.

The trial justice also pointed out that Dr. Wold had diagnosed Samara as having had schizophrenic episodes, which she believed would reoccur. Doctor Wold had expressed the opinion that because of Samara's condition, she could not adequately care for a child. Although one witness testified that she believed Samara could provide the physical care for a child, the trial justice noted that this witness had admitted that Samara attempted to communicate with the child through sign language, that Samara admonished the child for eating, and that the child had feeding problems. She also admitted having difficulty getting coherent answers from Samara to questions concerning the children.

The trial justice stated that the evidence concerning Samara's conduct indicated a "strong possibility" that the children would suffer physical and mental harm if returned to her, and therefore he found them dependent. He noted, however, that Samara had made progress in overcoming her problems, that she was taking steps to improve the situation, and that Samara's father was of great assistance in caring for the children. He therefore ordered the DCF to continue to attempt to reunite her and her children.

On appeal, Samara contends that the proof upon which the trial justice based his findings was insufficient to sustain the petition and that the adjudication of dependency should, therefore, be reversed. She also contends that the trial justice's finding of a "strong possibility" of harm to the children does not meet the applicable standard of proof.

Samara argues that the record is completely barren of any evidence indicating that her behavior was likely to have an adverse effect on the physical or emotional health of the children. The DCF maintains that the evidence is sufficient to support a finding that the children are actually suffering or are likely to suffer physical or emotional harm in Samara's care and that the adjudication of dependency should therefore be sustained.

It is well settled that in proceedings to determine neglect, dependency, or abuse, the rights of a parent are an important consideration. It is equally well settled, however, that the children's best interests and welfare outweigh all other considerations. *In re Lee and Colletta*, R.I., 442 A.2d 893, 897 (1982); *In re Lester*, R.I., 417 A.2d 877, 880 (1980).

We have therefore stated that to show dependency, the state must prove by clear and convincing evidence only that a child is actually suffering or is likely to suffer physical and/or emotional harm. *In re Jonathan*, R.I., 415 A.2d 1036, 1039 (1980). In ruling on the question of whether the state has shown that a child is dependent, however, the trial justice must articulate his findings concerning the welfare of the child in light of the parent's alleged misconduct. *Id.* On appeal, these findings are entitled to great weight and will not be disturbed unless the trial justice overlooked or misconceived the evidence or was clearly wrong. *In re Lee and Colletta*, 442 A.2d at 897; *see In re Joseph*, R.I., 420 A.2d 85, 89 (1980).

A review of the record in the instant case indicates sufficient evidence to support the findings of the trial justice. Although the trial justice noted that Samara had not physically abused the children, the testimony and evidence cited by the trial justice establishes that, as a result of Samara's bizarre conduct, the children are likely to suffer emotional harm if left in her care.

As the trial justice noted, Samara had a history of mental disorder and, although she had made progress, there was a very great possibility that she would have another psychotic episode. The psychiatrist's testimony indicated that Samara was schizophrenic and that she could not adequately care for a minor child. The testimony in the record also showed that Samara is not in touch with reality and that her behavior is often inconsistent with the welfare of the children.

Accordingly, we are of the opinion that the trial justice properly found that Samara's conduct is likely to be harmful to the children's best interests. The trial justice gave ample consideration to Samara's rights as a parent by ordering the DCF to develop a plan for her eventual reunification with her children.

For the above-stated reasons, Samara's appeal is denied and dismissed. The judgment of the Family Court is affirmed, and the case is remanded to the Family Court for further proceedings.