In re CRYSTAL, Joshua, and
Jacqueline A.

No. 82-92-Appeal.

Supreme Court of Rhode Island.

May 16, 1984.

Joseph N. Cassiere, Providence, for petitioner.

Thomas M. Bohan, Providence, for Dept. for Children and Their Families.

## OPINION

### BEVILACQUA, Chief Justice:

This is an appeal by Samara, the mother of three minor children: Crystal, Joshua, and Jacqueline. Samara appeals from a Family Court decree which terminated her parental rights and placed permanent guardianship of the children in the hands of the Department of Children and their Families (DCF) pursuant to G.L.1956 (1981 Reenactment) § 15–7–7.

The record reveals the following facts. In February 1976, Samara gave birth to her first child Crystal. Frances Chatterton, a visiting nurse who was providing followup home care for Samara, became alarmed at the manner in which Samara was caring for the child. According to Mrs. Chatterton, Samara stated that she was the Virgin Mary and Christ was the father of the child. Mrs. Chatterton testified that although she repeatedly instructed Samara in child care, Samara showed little interest and almost no initiative in providing the kind of care required by an infant. Concerned that the baby was not receiving adequate stimulation, Mrs. Chatterton contacted DCF.

Marjorie Reynolds, the social worker who monitored the case after the referral, testified that Samara seemed uninterested in the visiting nurse's child-care instructions. During one visit, Samara's response to the child's cries of hunger was to feed her a very small amount of formula and then put the baby back in the bedroom. As a result of her conclusion that Samara was emotionally unable to cope with the baby, Mrs. Reynolds sought a court order to place the child in temporary custody with DCF. That order was granted and Crystal was placed in a foster home. After Crystal's removal, a plan for Samara's eventual reunification with the child was developed. This plan included supervised bimonthly visits between Samara and Crystal. In addition, counseling and drug therapy were provided for Samara.

Doctor Vsevolod Sadovnikoff, a court-appointed psychiatrist, examined Samara in January 1977 for the purpose of providing the Family Court with a psychological evaluation of her. Doctor Sadovnikoff testified that he diagnosed Samara as suffering from a schizophrenic disorder and that in his opinion she was not capable of tending to the needs of a young child.

Two more children were subsequently born to Samara. Joshua was born in March 1977. Shortly thereafter he was removed from the home pursuant to a verbal ex parte detention order but was later returned until after the birth of Jacqueline, born in April 1979. Eugene LaPierre, the caseworker who followed the family after the birth of Jacqueline, testified that the home was heated solely by oven heat and that electricity was provided by means of an extension cord running from the first floor to the third floor, with exposed wires throughout the apartment. On at least one occasion, Samara informed Mr. LaPierre that she was teaching the children sign language because that was how Helen Keller had learned. Although social workers continually warned her of the dangers of allowing the infant to sleep with her in the bed, Samara persisted in these sleeping arrangements. LaPierre additionally testified that when he asked Samara whether she was taking the antipsychotic drugs, she responded that she was on "nature's medication."

Doctor Linda Tartell, a pediatrician who examined Samara's third child Jacqueline shortly after birth, testified to her belief that Samara was unable to care for her child. Doctor Tartell noted that the child was not physically abused. However, when the child cried, Samara responded by pressing her fingers upon the baby's eyelids and ordering her to stop crying. Samara informed Dr. Tartell that she fed Jacqueline when Jesus told her to, but that she did not feed her when she cried because the baby bit her. As a result of this

meeting, Dr. Tartell filed a physician's report of a battered and abused child.

Throughout 1979 Samara met regularly with Dr. Richard Lambert, a psychiatrist associated with the Providence Mental Health Center. Doctor Lambert testified to Samara's refusal to take her medication and his own concerns about a possible emerging psychosis. Doctor Lambert stated that in his opinion Samara's condition was recurring, and that as long as she remained in a severe psychotic state she was clearly unable to care for a young child.

In August 1979 Samara sought an independent psychiatrist to help her because she felt that the DCF psychiatrists were against her. The family contacted Dr. Patricia Wold, who met with Samara over a five-month period. Doctor Wold testified that at their first meeting Samara was incoherent and incapable of sitting still for the sixty-minute interview. Doctor Wold diagnosed Samara as schizo-affective because she experienced recovery after each episode, but stressed Samara's potential for recurring psychotic episodes. She further testified that without treatment Samara would be vulnerable to psychotic episodes for the rest of her life, and that even if Samara faithfully took her medication, it would be impossible to predict whether she could adequately care for her children.

Both Samara and her father Samuel testified about the adequacy of the care that Samara provided for the children. Samuel testified that although after the birth of Crystal, Samara was confused and frequently did not make sense, he did not feel that this behavior was unusual, and that notwithstanding this she gave the child adequate care. Samara testified to her ability to care for the children and her desire to live with them.

In May 1979 both Joshua and Jacqueline were removed from the home pursuant to an ex parte order. After a hearing in the Family Court, all three children were adjudicated neglected and dependent, and DCF was awarded legal custody. *In re Crystal,*

R.I., 448 A.2d 1226 (1982). The DCF subsequently filed three consolidated petitions seeking the involuntary termination of Samara's parental rights due to her alleged mental illness and resulting inability to properly care for her children. After trial, the trial justice granted the petition, finding that the best interests of the children required the termination of Samara's parental rights. Samara appeals from this decision on the grounds that DCF failed to fulfill their statutory duty to make reasonable efforts to aid in an adjustment of her behavior, and that DCF failed to prove that the children suffered or were likely to suffer physical or emotional harm.

## I

Samara argues that DCF failed to make reasonable efforts to aid in the adjustment of her behavior. General Laws 1956 (1981 Reenactment) § 15–7–7, the statute governing the termination of parental rights provides in relevant part:

"The court shall, upon a petition duly filed after notice to the parent and hearing thereon, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child if the court finds as a fact that notwithstanding reasonable efforts which shall be made by the said agency to encourage and strengthen the parental relationship. " * * *

"(b) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to the following: (1) Emotional illness, mental illness, mental deficiency or institutionalization of the parent including imprisonment, of such duration as to render it improbable for the parent to care for the child for an extended period of time.

"(c) The parent has a child in the care of a licensed or governmental child placement agency, either voluntarily or involuntarily, for a period of at least six (6) months and the court further finds that the integration of the child into the home

of the parent is improbable in the foreseeable future due to conduct or conditions not likely to change.

"* * * *

"The standard of proof shall be by clear and convincing evidence."

■ The statute thus provides as a prerequisite to termination that DCF make reasonable efforts to strengthen and encourage the family relationship. Specifically, the agency must prove by clear and convincing evidence that it has cooperated with the parents to design an appropriate program for reuniting the family, including suitable arrangements for visitation and the provision of services to ameliorate those problems preventing reunification. *In re Gabriel G.*, R.I., 460 A.2d 441, 443 (1983); *In re Kathaleen*, R.I., 460 A.2d 12, 14 (1983).

■ The record is replete with evidence of DCF's attempts at family reunification. Social worker Marjorie Reynolds testified that after Crystal's removal from the home, a caseplan was developed. Consisting largely of supervised biweekly visits between mother and daughter, the plan provided an opportunity for DCF caseworkers to monitor Samara's interaction with Crystal. Additionally, a program of psychiatric aid was developed whereby Samara was to participate in regular counseling sessions and undergo a regimen of antipsychotic drug therapy. Samara participated sporadically in the counseling sessions but declined to take her medication on a regular basis. The supervised visits between Samara and Crystal continued, with caseworkers observing that Samara's interactions with the child were minimal and at times inappropriate.

Following the removal of Joshua and Jacqueline from the home in May 1978, DCF formulated a second caseplan for the eventual reunification of the children and Samara. Similar to the arrangement with Crystal, the program involved periodic supervised visits during which the mother's ability to handle the children could be monitored. Psychiatric help was again provided during this time. However, Samara made infrequent use of the available counseling and declined to undergo drug therapy.

■ In reviewing the requirement that DCF make reasonable efforts to strengthen the parental relationship, this court must consider the totality of the circumstances of each particular case. *In re Ann Marie*, R.I., 461 A.2d 394, 395 (1983). The particulars of this case reveal an individual who suffers from chronic psychosis, rendering her unable to properly care for her children. When Samara's condition led to removal of the children from the home, DCF formulated a visitation plan. Pursuant to this plan, DCF attempted to alleviate the psychotic disorder that prevented Samara's reunification with her children by means of counseling and a regular course of drug therapy. Despite these efforts by DCF, caseworkers concluded that Samara remained incapable of properly caring for her children.

■ The trial justice found that DCF had met their statutory burden of proving by clear and convincing evidence that they had made reasonable attempts to strengthen Samara's family relationship. In a review of cases involving termination of parental rights, this court must examine the record to determine whether there is legally competent evidence to support the findings of the trial justice. *In re Kenneth*, R.I., 439 A.2d 1366, 1369 (1982). We will not disturb the findings of the trial justice unless he overlooked or misconceived material evidence or his decision was clearly wrong. *In re Armand*, R.I., 433 A.2d 957, 962 (1981); *In re LaFreniere*, R.I., 420 A.2d 82, 84 (1980). The evidence overwhelmingly demonstrates the existence of a specific and adequate caseplan through which DCF attempted to effect the reunification of Samara and her children. The trial justice did not misconceive or overlook material evidence in reaching his conclusion that DCF fulfilled its statutory duty, nor was his decision otherwise clearly wrong.

## II

■ Samara additionally urges reversible error in DCF's alleged failure to prove that the children suffered or were likely to suffer physical or emotional harm. Section 15–7–7 does not require a finding of harm as an essential prerequisite to the termination of parental rights.[1] The statute provides four separate classifications, each of which may serve as a ground for termination, but only one of which includes cruel or abusive treatment on the part of a parent.[2] The DCF in its petition to terminate did not rely on this ground. The trial justice found that the agency had met its proof by clear and convincing evidence as to the grounds relied upon.[3] Accordingly, Samara's appeal is denied and dismissed, the judgment of the Family Court is affirmed, and the case is remanded to the Family Court for further proceedings consistent with this opinion.

1. In support of her argument that a finding of harm must be made before parental rights may be terminated, Samara cites the case of *In re Jonathan,* R.I., 415 A.2d 1036 (1980). We would point out, however, that *In re Jonathan* concerned neglect or dependency proceedings under G.L.1956 (1981 Reenactment) § 14–1–3(H). In contrast to proceedings involving the termination of parental rights, § 14–1–3(H) requires proof that a child has been or is likely to be harmed either physically or emotionally.

2. The specific grounds provided in G.L.1956 (1981 Reenactment) § 15–7–7 are as follows:

"(a) The parent has willfully neglected to provide proper care and maintenance for the child for a period of at least one (1) year where financially able to do so. In determining whether the parent has willfully neglected to provide proper care and maintenance for the child, the court may disregard contributions to support which are of an infrequent and insubstantial nature.

"(b) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to the following:

(1) Emotional illness, mental illness, mental deficiency or institutionalization of the parent including imprisonment, of such duration as to render it improbable for the parent to care for the child for an extended period of time.

(2) Conduct toward any child of a cruel or abusive nature.

(3) Excessive use of a drug or alcohol to the extent that the parent loses his ability or is unwilling to properly care for the child.

"(c) The parent has a child in the care of a licensed or governmental child placement agency, either voluntarily or involuntarily, for a period of at least six (6) months and the court further finds that the integration of the child into the home of the parent is improbable in the foreseeable future due to conduct or conditions not likely to change. The court shall review the initial conduct or conditions which caused the child to come into the care of the licensed or governmental child placement agency and determine whether there has been a change in the circumstances of the parent. In determining such conduct or conditions the court shall consider the lack of a good faith effort of the parent over a continuous period of six (6) months after placement to adjust his circumstances, conduct or conditions to make the return of the child possible or the failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such an extended duration of time that it appears reasonable that no lasting adjustment can be affected [effected].

"(d) The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month's period shall constitute prima facie evidence of abandonment or desertion."

3. The DCF alleged two specific grounds for termination: §§ 15–7–7(b)(1) and (c).