**In re FREDERICK and Josephine C.**

**87–428–Appeal.**

Supreme Court of Rhode Island.

July 18, 1988.

Laureen Quaranto D'Ambra, Dept. of Children and their Families, Francis B. Brown, Providence, CASA Unit, for plaintiff.

Barbara Hurst, Asst. Public Defender, Glenn R. Friedmann, Guardian-Ad-Litem, Johnston, for defendant.

## OPINION

SHEA, Justice.

This matter is before the Supreme Court on appeal from a decree of the Family Court that granted a petition to terminate parental rights filed by the Department of Children and their Families (DCF). The petitioner (the mother) has three minor children. Her parental rights to the two older children, Josephine and Frederick, were terminated. She raises several issues that we shall address in this opinion. We affirm.

The DCF first became involved with the family in April 1982 following a complaint

by the children's father.[1]  He had alleged that the mother had neglected and physically and emotionally abused their two children.  Following an investigation, DCF closed the case without taking any action.

In October 1983 DCF received a complaint from an individual who found Frederick running down a street naked.  Soon thereafter, the mother admitted dependency, thereby voluntarily placing the children with DCF.  The court ordered the children placed in the home of their maternal grandparents where the mother had been residing.  In September 1984 the court awarded physical custody of the children to the mother but required her to obtain the court's permission if she intended to move out of the maternal grandparents' home.  However, in October 1985 after the Child Abuse and Neglect Tracking System had received a complaint from the Providence police department stating that the children had been wandering alone at approximately 6:00 a.m., DCF again took custody of the children.  This was the fourth time the children had been found wandering by themselves in different areas of Olneyville.  On June 26, 1986, DCF filed a petition to terminate the mother's parental rights.

At the hearing on the petition to terminate, evidence established that the mother had been ordered in March 1984 to undergo psychiatric evaluation and to attend counseling through the Project Child program at the Providence Center.  Although she participated initially, she became less cooperative and refused to keep several scheduled appointments.  Haven Miles, a psychiatric social worker who evaluated the mother at the Providence Center, testified that the mother used a "very harsh negative tone of voice with the children [and during the sessions] the children committed very minor infractions of unstated rules [in reaction to which the mother's] punishment was to hit or shake each of the children."  Nevertheless, the mother stated to Ms. Miles that she did not have any problems with the children and was not in any need of treatment.

Doctor Amy Bellows, a psychologist at the Providence Center, evaluated the mother and testified: "[The mother] tended to blame others rather than herself for problems * * * she seems to have difficulties having close relationships with other people, that she is somewhat impulsive, sometimes confused in her ability to judge reality."

The mother was also evaluated by Dr. James Greer, a psychiatrist at the Providence Center, on two occasions.  Doctor Greer testified that the mother seemed to experience delusional thought patterns.  He diagnosed her as having either paranoid schizophrenia [2] or paranoid personality,[3] although he could not state with certainty which of the two disorders she had.  He recommended that she have a trial period of the antipsychotic medicine Prolixin.  Doctor Greer testified that the drug causes severe side effects in approximately 40 percent of the patients who take it.  He admitted that the medicine would only be effective in alleviating symptoms if the correct diagnosis were paranoid schizophrenia.  His plan was to administer the medicine and observe whether there was any reduction in her delusional thinking.  However, the mother, with the advice of her guardian, chose not to take the antipsychotic medicine.

1. The records of DCF reveal that on September 30, 1986, the rights of the children's father were terminated after he failed to appear after receiving notice through publication.

2. Steadman's Medical Dictionary defines "schizophrenia" as "the most common type of psychosis, characterized by a disorder in the thinking processes, such as delusions and hallucinations, and extensive withdrawal of the individual's interest from other people and the outside world, and the investment of it in his own."  It defines "paranoid schizophrenia" as "characterized predominantly by delusions of persecution."  Steadman's Medical Dictionary 1261 (5th unabridged Lawyer's Ed. 1982).

3. Steadman's Medical Dictionary defines "paranoid personality" as "a [personality] disorder characterized by hypersensitivity, rigidity, unwarranted suspicion, jealousy, and a tendency to blame others and ascribe evil motives to them; though neither a neurosis or psychosis, it interferes with the individual's ability to maintain interpersonal relationships."  Steadman's Medical Dictionary at 1061.

Linda Boutelier, the program coordinator of a parenting-skills program in Kent County, testified that the mother had participated in the program, which consisted of classes, group discussions, and home visits. Ms. Boutelier testified that she had recommended that the mother not be reunited with her children if she continued to refuse medication. She also stated that the mother seemed to be hallucinatory or delusional and had trouble supervising the two children.

While participating in the parenting-skills program, the mother gave birth to her third child, Michael. Ms. Boutelier testified that after the birth of Michael, the mother's bonding with Frederick and Josephine seemed to decrease.

The mother was also interviewed by Dr. Paul Malloy, a clinical psychologist at Butler Hospital. Doctor Malloy testified that he conducted a Wechsler Intelligence Test. She scored a 72 on the test, which placed her in the lower-border-line-intelligence range. He conceded that "[many] people with this level of intellectual ability are capable of functioning adequately as parents, although many such people also are limited by their intellectual ability in handling certain difficult problems in a stressful situation." However, he stated that he had "serious concern about the children's well being, because of [their mother's] paranoid thinking." He further stated that the "combination of these two factors in the present case [namely, lower-border-line intelligence and paranoid thinking] were the cause of [the mother's] failure as a parent thus far."

The DCF also presented Catherine Uhler-Hammond, the director of the Silver Lake Child Care Center, as a witness. Both Josephine and Frederick were enrolled in the center's program from June through September of 1986. Ms. Uhler-Hammond testified that the children were often dirty, their clothes were ill fitting, and "[m]any times they had an odor of urine and feces." She also testified that "a lot of times this mother slapped her kids in front of us. A lot of times she was yelling at them in front of us. It was stressful. It was not conducive to whatever we have been taught about [a] good parent/child relationship."

Several DCF caseworkers also testified. Shortly after the mother had voluntarily placed her children with DCF in October 1983, she spoke with DCF caseworker Rosemary McGwin. Ms. McGwin testified that the mother had told her that "she had heard voices in Star Market." Ms. McGwin also stated that the mother had fantasized that she had another child,[4] which had been stolen away from her in a conspiracy which involved Ms. McGwin. The mother told Ms. McGwin that "they" attempted to cover up this plot against her by telling her that she had suffered a miscarriage.

Other DCF caseworkers involved in the case testified at length about how the mother often resisted or refused to take part in case plans that they had devised. They also discussed their difficulties in their attempts to reunify the family.

The only witness presented on behalf of the mother was Dr. Patricia Wold, a psychiatrist working in private practice. Doctor Wold gave her opinion that the mother was not mentally ill and should not be taking Prolixin. She felt that the mother would have benefited from a program supervised by persons who had experience in dealing with people of limited intelligence. She said that the mother cared a great deal for her children, as was evidenced by how hard she was fighting to get them back.

After an exhaustive review of the evidence the Family Court judge ruled that the mother's parental right to Frederick and Josephine should be terminated. He based his ruling on the following findings of fact, which he stated that he found by clear and convincing evidence:

"[T]he Department of Children and Their Families has made all reasonable efforts to encourage and strengthen parental relationship, i.e.: one, counseling at Kent County Reunification Program, Project Child, at the Providence Center; two, that DCF provided ongoing visitation and

4. At this time the mother only had two children, Josephine and Frederick.

counseling on a regular basis through the case plan, and besides this the mother had psychological testing, evaluations, and treatment; three, that the mother has exhibited a lack of good faith over a period of more than six months to comply with the requirement of the case plan. Although she attended over 100 hours of counseling, she always denied she needed help, or that she was in need of counseling. Her lack of interest and participation in counseling sessions, and because of the above, mother's attitude in and conduct was not conducive to reestablishing a parental relationship with her children; four, that mother is suffering from emotional illness and/or mental illness, and the prognosis indicates that she will have [recurrences] of such illness; that such emotional illness will be of such duration that will render it improbable for her to care for her children for any period of time in the future, and that the original conditions that caused the children to be brought into the care of the State have not changed in any appreciable way, despite all efforts of the State to effectuate such change."

■ The mother now argues that the Family Court judge erred in finding that DCF made reasonable efforts to encourage and strengthen the parental relationship, as required under G.L. 1956 (1981 Reenactment) § 15–7–7, as amended by P.L. 1984, ch. 204, § 3; *see also In re William, Susan, and Joseph*, 448 A.2d 1250 (R.I. 1982). The mother alleges that DCF's efforts were not reasonable because they preconditioned unification between the mother and her children upon the mother's agreement to take the drug Prolixin, despite the drug's potentially serious side effects.

A review of the evidence shows that DCF may have exerted inappropriate pressure upon the mother to take the drug. The Family Court judge said that he was "disturbed" by letters written by a DCF caseworker that stated that because the mother refused to follow through on recommended treatment, he had no alternative but to file a petition to terminate. However, the Family Court judge stated that

"if the Court believes that as stated by [the caseworker's] letter, this was the only reason that he filed this termination petition, it would, without hesitation, dismiss, this action. However in spite of [the caseworker's] letter, the Court feels that he did what was required of him under the General Laws of the State of Rhode Island in a termination proceeding."

We agree. The evidence was clear and convincing that DCF had made reasonable efforts to strengthen the parental relationship. From the time that DCF took custody of the children, the mother resisted and often refused to participate in DCF's case plan. The DCF took custody of the children twice. The first time it placed them in their maternal grandmother's house where the mother was staying. This was an attempt to provide adequate supervision for the children while maximizing the mother's time with them. The DCF's efforts to strengthen and encourage the parental relationship also included counseling, parental-skills classes, and psychological testing, evaluation, and treatment.

■ The mother next argues that the Family Court judge erred in finding that she was an unfit parent under § 15–7–7(b). She concedes that there was evidence presented at the hearing that indicated that she may not have been "the best mother." However, she contends that the evidence, when viewed in its entirety, did not establish unfitness. We disagree.

Section 15–7–7(b)(1) states in pertinent part:

"(b) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to the following:

(1) Emotional illness, mental illness, mental deficiency * * * of such duration as to render it improbable for the parent to care for the child for an extended period of time."

As we pointed out above, Dr. Greer testified that the mother seemed to experience delusional thought patterns, and diagnosed her as having either paranoid schizophrenia

or paranoid personality. Similarly, Dr. Malloy testified that "there was a reasonable psychological certainty that [she had] a clinically significant problem [of] paranoid thinking, [and] that it existed for a considerable length of time." The doctor conceded that an individual with her psychological disorder or her limited intelligence might be a fit parent. However, in his opinion, the combination of these factors was preventing this mother from learning parenting skills. In rebuttal Dr. Wold gave her opinion that the mother was not suffering from any form of psychosis.

The Family Court judge found the testimony of DCF's experts more credible than the testimony of the mother's expert on this issue. "[D]ecisions of a trial justice on questions of credibility carry great weight because of the advantage he had in seeing and hearing the witnesses as they testified. Unless the transcript clearly discloses that the trial justice was mistaken in his judgment of the credibility of the witnesses, we shall not disturb his decision." *Lee v. Raymond*, 456 A.2d 1179, 1184 (R.I. 1983). After our review of the testimony of these experts, we cannot say that the Family Court judge's conclusions were clearly wrong.

■ The mother next argues that the Family Court judge erred in terminating her parental rights because DCF failed to introduce sufficient evidence that the children had suffered and were likely to suffer significant harm. However, in *In re Crystal A.*, 476 A.2d 1030, 1034 (R.I. 1984), this court made clear that "Section 15–7–7 does not require a finding of harm as an essential prerequisite to the termination of parental rights." Rather, "the best interests and welfare of the child outweigh all other considerations." *In re David*, 427 A.2d 795, 801 (R.I. 1981).

Several witnesses testified that continuation of the parental relationship was not in the best interests of the children. Included among these were Dr. Spencer DeVault, a clinical psychologist, who evaluated Frederick and testified that in his opinion "the home situation [with the mother] was not a good one, and that [Frederick] should be continued in placement and not returned to mother." Similarly, Dr. Paul Malloy stated that he had "serious concern about the children's well being because of [the mother's] paranoid thinking." We agree that the evidence was clear and convincing that termination of the mother's parental rights was in the best interests of the children.

The mother next argues that the Family Court judge erred in taking judicial notice of factual findings and legal rulings made by another Family Court judge in a separate proceeding that required a lesser burden of proof. We have reviewed those factual findings and legal rulings and find that they were either not relevant or not material to any determination that the Family Court was required to make under § 15–7–7.

■ The mother finally argues that the Family Court judge erred in shifting the burden of proving the mother's unfitness away from DCF, thereby requiring the mother to prove her own fitness. She refers to a statement by the Family Court judge in which he said that "since [the mother] did not testify, there is no evidence put forth by the Defendant as to her parenting ability relative to the child at home." The mother took this statement completely out of context. The Family Court judge was merely alluding to the fact that after DCF had satisfied its burden of proving the mother's unfitness, the mother's rebuttal evidence was inadequate. The Family Court judge had just rejected an argument by the mother that the fact that the mother had a third child at home with her whom DCF had so far allowed to remain provided adequate rebuttal evidence against the testimony showing her unfitness. We find that the Family Court judge's statement, when taken in context, was completely proper.

For these reasons the mother's appeal is denied and dismissed, the decree of the Family Court is affirmed, and the papers of the case are remanded to the Family Court.