### In re JOHN F. et al.

### No. 98–602–Appeal.

Supreme Court of Rhode Island.

Oct. 27, 2000.

Thomas J. Corrigan, Providence, Frank P. Iacono, Jr., for plaintiff.

Kelly Monteiro, Paula Rosin, Providence, for defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

This case came before the Court for oral argument on October 3, 2000, pursuant to an order that directed both parties to appear in order to show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown. Accordingly, we affirm the decree of the Family Court. The facts pertinent to this appeal are as follows.

The respondent mother, Celia Felix, appeals from a Family Court decree terminating her parental rights to her children, John Paul, born on August 13, 1985, and his younger brother, Anthony, born on May 4, 1988. The Department of Children, Youth and Families (DCYF) first became involved with the boys in November 1992 as the result of allegations that respondent had been guilty of neglect. Dependency and neglect petitions were filed on July 13, 1993, on behalf of both children. Although a hearing was held in March 1994, a decree finding neglect was not entered until January 6, 1997, almost three years later. Additionally, petitions to terminate respondent's parental rights were filed on July 19, 1996, and heard by the trial justice on June 4 and June 10, 1998.

Marilyn Salk (Ms. Salk), the social worker originally assigned to the case in 1992,

testified that DCYF became involved after the children had allegedly been left at home unattended. Thereafter, in January 1993, Ms. Salk began planning services for respondent and cautioned her about choosing appropriate caretakers for the children. On January 4, 1993, a case plan was prepared with the objective of arranging appropriate supervision for the children. In May 1993, respondent left both children with Armando Mercedes, her stepfather, a known child molester who had molested the respondent during her youth. The unfortunate and unnecessary result was that both children were molested. Despite this somber event, the boys' placement remained with their mother. Ms. Salk prepared five additional case plans, designed with similar objectives: to maintain the boys in respondent's home, to provide sexual abuse counseling for the children, and non-offender sexual abuse counseling for the respondent, while maintaining a safe and stable residence for the family.[1]

In October 1993, Ms. Salk also made arrangements for the boys and the respondent to receive counseling services at the Family Life Resource Center. These arrangements included funding of the services by DCYF and transportation, if needed. At that time, respondent indicated that she could provide her own transportation. Throughout her contact, Ms. Salk emphasized the importance of attending the counseling services. Although respondent never requested transportation assistance, transportation was provided because of respondent's inconsistent attendance.[2]

Deborah Archer (Ms. Archer), a clinical social worker with the Family Resource Center, noted that although respondent was loving and nurturing, and interacted well with the boys, her lack of follow-through in maintaining a stable home life remained a major concern.[3] Family Life Resources terminated services for respondent in April 1995 because of her chronic lack of compliance with the case plans. Ms. Archer also noted that throughout this period a lack of a stable lifestyle for the boys remained the biggest concern.

Ms. Salk again arranged counseling services and offered funding and transportation. However, this time respondent was instructed to schedule the appointment on her own; she failed to do so.

In September 1995, respondent was incarcerated for two weeks at the Adult Correctional Institutions for driving without a license and selling leased property. DCYF placed the boys with their maternal grandmother while their mother was incarcerated. Upon her release, respondent expressed a willingness to allow the children to remain with their grandmother, apparently recognizing the need to straighten out her life before regaining custody of her sons.

In December 1995, John Paul and Anthony's case was transferred to Patricia Logan (Ms. Logan). Ms. Logan prepared three reunification case plans containing goals similar to the five plans previously prepared by Ms. Salk. Ms. Logan also attempted to visit respondent at the several residences that she shared with various roommates. Sadly, although respondent agreed to comply, she failed to follow through with any of the counseling plans.[4]

---

1. During the time in which Ms. Salk was involved, respondent, without regularly notifying DCYF, moved the family approximately thirteen times. As a result, the boys' already unstable environment was compounded by frequent school changes and resulting poor attendance.

2. On June 30, 1994, the Family Court ordered respondent to comply with the counseling plans.

3. On different occasions, both boys expressed concern about their transient lifestyle and the lack of a consistent caretaker.

4. During the time in which Ms. Logan handled the case, respondent had moved three more times.

In October 1996, the boys experienced yet another unfortunate event when their grandmother requested that DCYF remove the children from her home. The boys were placed in a foster home until the third case worker, Karen Vartebedian (Ms. Vartebedian), entered the case in October 1997.[5] Each case worker notified respondent of the importance of counseling and DCYF's willingness to provide transportation or bus passes. The mother continued to indicate that she needed no transportation assistance.

The respondent visited the children biweekly under DCYF supervision. However, in March 1998, the visits were moved to the DCYF offices because Ms. Vartebedian had concerns about respondent's roommates and the inevitable termination of rights. In addition, Ms. Vartebedian assessed both boys as being behind in their grade level and that the younger boy, Anthony, had severe behavioral problems. At trial Ms. Vartebedian stated, "[I]f we were going to follow through with the TPR, we didn't want to set these boys up thinking that they would be going home * * *." Ms. Vartebedian also referred the boys for an evaluation with Vicki Moss (Ms. Moss), a clinical child psychologist.

Ms. Moss found that Anthony is overwhelmed by the simple requirements of daily living. Her primary diagnosis of Anthony was a reactive attachment disorder that stems from inconsistent care and attention during the first two years of life. Ms. Moss found John Paul to be depressed and to suffer from post traumatic stress and expressive language disorder. Ms. Moss said she thought that placement for the children would be difficult because of their age and needs, and concluded that these children "will be very difficult for anyone to parent."

The respondent attributes her failure to comply with counseling plans to a lack of transportation and conflicts with her work schedule. In addition, respondent says that no one told her that she needed to contact the Community Counseling Center to arrange for an appointment. In support of her appeal, respondent raises two issues: first, that the trial justice overlooked material evidence, specifically, DCYF's failure to make reasonable efforts to encourage and strengthen the parental relationship between respondent and her children, and second, that the trial justice overlooked DCYF's arbitrary and capricious decision to infringe upon the children's psychological need for stability and well-being by altering the visitation arrangements that were not in the children's best interests. We deny and dismiss the appeal.

### Discussion

■ In reviewing a ruling of the Family Court terminating a parent's rights to her children, we must examine the record to determine whether legally competent evidence exists to support the trial justice's findings. *In re Jennifer R.,* 667 A.2d 535, 536 (R.I.1995) (citing *In re Crystal A.,* 476 A.2d 1030, 1033 (R.I.1984)). "A Family Court justice's findings are entitled to great weight and will not be disturbed absent a showing that the trial justice was clearly wrong or that material evidence was overlooked or misconceived." *In re Nicole B.,* 703 A.2d 612, 615 (R.I.1997) (citing *In re Antonio G.,* 659 A.2d 672, 673 (R.I.1995)).

■ We are of the belief that the evidence presented at trial clearly supports the decision of the trial justice to terminate respondent's parental rights. Evidence produced at trial demonstrated that respondent completely and continuously failed to provide a secure and stable home environment to these children. The respondent has lived a transient lifestyle, moving the children eighteen times during the eight years of DCYF involvement. An unfortunate product of this itinerant life is that John Paul and Anthony were forced to miss school and, according to Ms. Var-

---

**5.** The respondent has moved two additional times since May 1997.

tebedian, both were functioning below grade level.

Ms. Moss testified that the younger boy, Anthony, generally scored below average on tests designed to measure cognitive skills and lagged behind children in his age group in a number of academic and social skills. She testified further that her diagnosis of Anthony with "Reactive Attachment Disorder" stemmed from "inconsistent care and attention during the first two years of life * * *."

As for John Paul, Ms. Moss testified that he also tested below average, specifically on verbal and performance IQ tests. In addition, she said that he has a strong tendency to avoid emotional situations, which is unusual for a child his age, and that this behavior "indicates that the normal emotional development has been thwarted." John Paul was also described by Ms. Moss as a "parentified child, a child who takes on the role of parent * * *," yet, under the circumstances, he "shows remarkable resilience."

Convincingly disturbing evidence was also presented concerning the lack of security and the instability of the children's home environment. This case came to the attention of DCYF because the children, then ages seven and four, were left at home unattended. Thereafter, respondent opted to leave the children under the supervision of her stepfather, a known child molester who had also molested her as a child. Evidence was presented that, while under his "supervision," the boys were also molested by the stepfather, a person charged with their care and safety. Besides testifying about this horrid event and the boys' eighteen moves since the beginning of this case, Ms. Vartebedian also testified that the children's home environment was inappropriate. Specifically, on one visit to respondent's numerous apartments, Ms. Vartebedian witnessed "three adults in the apartment, all undressed."

The trial justice also received a plethora of evidence concerning respondent's lack of consistency in attending counseling services for herself and her children. Although each case worker for DCYF emphasized the importance of respondent's compliance with the case plans and counseling services, and notwithstanding DCYF's offer of transportation to the counseling centers, respondent consistently informed DCYF that she could provide her own transportation. However, respondent continuously failed to attend any programs required under the case plans, saying that she had no transportation.

The trial justice reviewed the evidence presented at trial and found that DCYF had proved the respondent to be unfit by clear and convincing evidence. The respondent completely failed to provide John Paul and Anthony with a stable, secure, and consistent home life, the primary responsibility of a parent. Moreover, she failed to avail herself of the numerous services offered to her by DCYF, despite the fact that the importance of the respondent's attendance at these programs was repeatedly emphasized. Furthermore, the children have been placed in a pre-adoptive foster home and are progressing well. The trial justice indicated that termination of the respondent's parental rights would be in the best interests of both boys. We agree.

Based on the findings of the trial justice and the record before this Court, there is no question that these children have suffered demonstrable harm from the instability, insecurity, and inconsistency in their lives. Accordingly, the respondent's appeal is denied and dismissed. The decree of the Family Court is affirmed. The papers of the case are remanded to the Family Court.

Justice FLANDERS did not attend the oral argument but participated on the basis of the briefs.