**Supreme Court**

No. 2014-277-Appeal.
(13-1241-1)
No. 2015-216-Appeal.
(13-1241-2)

In re King J.                                    :


In re Saint J.                                   :


NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2014-277-Appeal.
(13-1241-1)
No. 2015-216-Appeal.
(13-1241-2)

In re King J.                   :

In re Saint J.                   :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**  The respondent, Jason James (respondent or James), appeals from decrees entered in the Family Court finding dependency as to his sons, King and Saint.  The matter came before the Supreme Court on September 28, 2016, pursuant to an order directing the parties to appear and show cause why the issues raised by this appeal should not be summarily decided.  After hearing the arguments of counsel and reviewing the memoranda submitted on behalf of the parties, we are satisfied that cause has not been shown.  Accordingly, we shall decide the matter at this time without further briefing or argument.  For the reasons set forth herein, we affirm the decrees of the Family Court.

**I**

**Facts and Travel**

**A**

**Dependency as to King**

The Department of Children, Youth, and Families (DCYF) became involved with King and the James family in September 2013, after receiving a call to its hotline alleging that respondent hit King and kicked a door, which struck King.  On October 9, 2013, DCYF filed a

-1-

petition with the Family Court alleging that respondent and Ms. Marilyn James neglected and abused King.[1] The petition was later amended to include allegations of dependency.[2] Beginning on January 24, 2014, respondent's trial as to King's dependency was held before a justice of the Family Court.

The respondent testified first.[3] He stated that, following high school, he entered the United States Marine Corps. After two deployments, he was honorably discharged in 2007. He has since been involved with the Providence Veterans Administration Medical Center (VA) in a program that assists veterans with reintegration after deployment. The respondent testified that he was diagnosed at the VA with major depressive disorder.

The respondent testified that, in September 2013, a DCYF investigator, Ms. Michaela Dolan, came to his home. The respondent denied telling Dolan that he suffered from PTSD and should be medicated. Afterwards, respondent met with Christine Baron, M.D. (Dr. Baron) at Hasbro Children's Hospital. In response to Dr. Baron's inquiry about bruising on King's abdomen and rib cage, he testified that he denied seeing any bruises and suggested it could be a rash instead. The respondent also testified that Dr. Baron asked him about the extra digit on each of King's hands. In his testimony, respondent stated that King had "ten and a half fingers." When asked if he denied knowing what happened to King's other "half a finger," respondent stated that it would be "absurd" to do so. He could not recall what he told Dr. Baron about

---

[1] To avoid confusion with Jason James, we will refer to Marilyn James as Marilyn. No disrespect is intended.

[2] On November 9, 2014, Marilyn admitted dependency as to King and subsequently admitted dependency as to Saint.

[3] Throughout respondent's testimony, the trial justice reproached him for his behavior and demeanor while testifying. After numerous disruptions, she ultimately appointed a guardian ad litem on his behalf.

King's missing digit and stated that he did not answer Dr. Baron's questions "because of how she scrutinized me."

Next, a DCYF caseworker, Ms. Stacey Goncalves, testified that she became involved with this case on October 7, 2013. Goncalves said that, at the time, Marilyn stayed with her mother, Ms. Barbara Suggs. On October 11, 2013, Goncalves visited Suggs's household, where King should have been staying pursuant to a safety plan. King was there and appeared safe. On October 25, 2013, Goncalves again visited Suggs's house because she was unable to contact her or King's parents. After not finding King at Suggs's house, Goncalves went to respondent's home. She was accompanied by her supervisor, Ms. Denise Zolnierz, and Providence police officers. Goncalves testified that respondent refused to let them enter and would not let them see King to assure them that he was safe. After the fire department and additional police officers arrived, the police gained access to the residence and retrieved King. After this incident, King was placed in a foster home, and Goncalves arranged a meeting with respondent and Marilyn to discuss visitation and a case plan.

In her testimony, Goncalves discussed the supervised visits between King, respondent, and Marilyn. The first supervised visit occurred on November 7, 2013. During this visit, Goncalves discussed a case plan with respondent and Marilyn. However, respondent did not want to follow the plan because he did not think that the allegations against him were accurate. Also during that visit, respondent told Goncalves that he removed an extra finger from King's hand with a knife. Goncalves testified that she told respondent he should have sought medical attention, to which he responded that he knew what he was doing.

Goncalves also testified about instances of respondent's inappropriate behavior. For example, Goncalves noted a visit at which King lightly bit respondent, and respondent then bit

him back.  She also discussed a doctor's visit on November 26, 2013, when respondent held King upside down.  After the doctor and Goncalves asked respondent to stop, he said he would stop only because it made them feel uncomfortable.  At this visit, the doctor also recommended that King have his other extra finger removed.  However, respondent said that he wanted to wait for King to be able to make his own decisions.[4]

Goncalves testified about a visit when respondent made comments about "baby snatchers" taking King away, which appeared to upset King.  Goncalves cautioned respondent to stop making those comments, but he persisted despite additional warnings.  Goncalves ended the visit early because of respondent's behavior.  At another visit, respondent repeatedly lifted King in the air by his hands and wrists.  When Goncalves asked him to stop because it was dangerous, respondent told her to stop talking to him because he knew what he was doing.  Also during this visit, respondent and Marilyn let King run around the visiting room in just a diaper.  When Goncalves asked respondent to dress King, he asked her if she "knew the f**king temperature."  Goncalves recounted another visit when King dropped a toy and respondent "grabbed him by his ankles and lifted him backwards to get the toy from behind the couch."

Goncalves also testified about positive observations from the supervised visits.  She noted one visit when respondent brought a toy that appeared to scare King.  Goncalves said that respondent gradually introduced the toy to King, to help him overcome his fear.  On another occasion, respondent brought a skateboard to the visitation.  After being told that he could not use the skateboard in the visitation room, respondent "was good about redirecting and telling [King] not to use it."  Additionally, Goncalves acknowledged that respondent and Marilyn usually brought fruit for King at every visit.

---

[4] In April 2014, DCYF filed a motion asking the Family Court to grant consent for the surgical removal of King's extra digit.

-4-

The last visit that Goncalves supervised occurred on February 6, 2014. The respondent became aggressive towards Goncalves after she told him that King bit another child at daycare. The respondent threatened Goncalves, saying, "Stacey, you know I know where you live and I'm going to take your kid and then I'm going to send every Jehovah Witness in the state to your house." Goncalves ended the visit and capitol police had to escort respondent out of the building.

Finally, Ms. Denise Zolnierz, Goncalves's supervisor, testified. Zolnierz also discussed the October 25, 2013 incident at respondent's residence. Her testimony was consistent with that of Goncalves. Zolnierz said that, after entering the residence, she found swords lying on the living-room floor and a bathtub filled with water.

Zolnierz testified about another interaction with respondent and Marilyn on the phone. According to Zolnierz, respondent screamed in the background as she spoke with Marilyn. Zolnierz stated that respondent said DCYF "are confused and f**ked up" and called her a "ho." After this, she met with respondent and Marilyn to address respondent's disruptive behavior, including his use of inappropriate expressions like "baby snatcher." Zolnierz also discussed the visitation program at the Providence Children's Museum because she thought that the program could make the visits more positive. However, respondent did not sign the release to participate in the program.

On April 16, 2014, the Court Appointed Special Advocate (CASA) sought to amend the petition to include an allegation of dependency based on respondent's mental health issues.

After considering the testimony of respondent, Goncalves, and Zolnierz, the trial justice granted CASA's motion to include a dependency allegation as to both King and Saint.[5]

On May 9, 2014, the trial justice rendered a bench decision granting DCYF's dependency petition as to King. The trial justice summarized the testimony of respondent, Goncalves, and Zolnierz. After making factual findings, the trial justice found, by clear and convincing evidence, that respondent "failed to provide this child with a minimum degree of care, supervision and guardianship pursuant to the statute." She also found that respondent "inflicted physical injury upon this child, including the door kicking incident and the cutting off of the digit on his finger." The trial justice found King dependent as to respondent "given his needs as well as the mental health issues of [respondent]." She determined that it was in King's best interest to be placed out-of-home and ordered supervised visitation until respondent addressed his mental health issues, completed a psychological evaluation, and attended domestic violence counseling and parenting classes. Accordingly, King was committed to the care, custody, and control of DCYF. The respondent filed a notice of appeal on July 17, 2014.

**B**

**Dependency as to Saint**

DCYF became involved with King's brother, Saint, after his birth on March 18, 2014. DCYF filed a petition alleging neglect of Saint by respondent and Marilyn. As noted above, this petition was amended on April 16, 2014, to include a dependency allegation based on respondent's mental health issues. On February 11, 2015, a trial to determine Saint's dependency was held before the same Family Court justice. At the beginning of the trial, the trial justice took judicial notice of the dependency decree in King's case.

---

[5] While the trial commenced with respect to only King, we note that Saint was born on March 18, 2014, and a second petition was brought on his behalf on April 1, 2014.

-6-

A DCYF caseworker, Mr. John Campopiano, was the only witness to testify. He first became involved with King, Saint, and the James family in September 2014. When Campopiano received this case, King and Saint were already in foster care. Campopiano explained that his relationship with respondent "took off in a positive way" and differed from the relationship that respondent had with Goncalves and Zolnierz. He described his experience with respondent as "a more positive, more free-flowing, natural progression." Campopiano said he did not observe any volatility during the supervised visitations and never had to end a visit early due to respondent's behavior. He testified that respondent had "always been appropriate with both the children, especially with Saint."

Campopiano also discussed the case plan services that he sought to continue, including a substance-abuse assessment for respondent and mental health counseling for both parents. Campopiano said that he discussed these services with respondent, but respondent did not find them necessary. He also discussed the ordered psychological evaluation that respondent had not completed. Although Campopiano respected respondent's reasons for not wanting to complete it, he acknowledged that the psychological evaluation was "still a need."

On February 25, 2015, the trial justice rendered a bench decision finding Saint dependent. She summarized Campopiano's testimony and considered respondent's failure to adhere to his case plan because he did not think that he needed its services. The trial justice also noted the testimony and factual findings from King's trial, specifically, the testimony about respondent removing King's extra digit and his "appalling" conduct towards Goncalves and Zolnierz. Although the trial justice acknowledged that "there is no evidence that Saint has been harmed to the extent that King was," she said that she would not ignore respondent's treatment of King.

Accordingly, Saint was committed to the care, custody, and control of DCYF. The respondent filed a timely notice of appeal on April, 10, 2015.

## II

### Standard of Review

Under G.L. 1956 § 14-1-3(6), dependency is defined as:

> "[A]ny child who requires the protection and assistance of the court when his or her physical or mental health or welfare is harmed or threatened with harm due to the inability of the parent or guardian, through no fault of the parent or guardian, to provide the child with a minimum degree of care or proper supervision because of:
>> "(i)     The death or illness of a parent; or
>> "(ii)     The special medical, educational, or social service needs of the child which the parent is unable to provide."

In deciding dependency allegations, "the Family Court is required to make its findings by clear and convincing evidence, in accordance with Rule 17(b) of the Family Court Rules of Juvenile Proceedings." In re Jermaine H., 9 A.3d 1227, 1231 (R.I. 2010). "We have therefore stated that to show dependency, the state must prove by clear and convincing evidence only that a child is actually suffering or is likely to suffer physical and/or emotional harm." In re Crystal, Joshua, and Jacqueline A., 448 A.2d 1226, 1229 (R.I. 1982). "[I]t is incumbent upon the trial justice to set forth the facts upon which the finding rests." In re Jermaine H., 9 A.3d at 1231.

"This Court's standard of review requires that 'we examine the record to determine whether legally competent evidence exists in it to support findings made by the trial justice.'" In re Jermaine H., 9 A.3d at 1231 (quoting In re Adner G., 925 A.2d 951, 957 (R.I. 2007)). The trial justice's "findings are entitled to great weight and will not be disturbed absent a showing that the trial justice was clearly wrong or that material evidence was overlooked or misconceived." In re Tamika R., 973 A.2d 547, 550 (R.I. 2009) (quoting In re Ephraim L., 862

A.2d 196, 200 (R.I. 2004)). Thus, "it is our function to determine whether legally competent evidence exists in the record before us to support the finding, by clear and convincing evidence, that the children were dependent * * *." In re Jermaine H., 9 A.3d at 1231.

## III

## Discussion

## A

## Decree of Dependency as to King

On appeal, respondent argues that the trial justice's decisions declaring King and Saint dependent are not supported by clear and convincing evidence. The respondent challenges the trial justice's finding that he physically injured King based on the alleged removal of King's extra digit. He contends that DCYF failed to put forth any medical evidence showing that he removed King's extra digit or that "[his] actions harmed his son in any way." The respondent also claims that the trial justice's findings are "rife with extraneous and unproven allegations that existed nowhere in the record."

Our review of the record reveals sufficient evidence to support the trial justice's finding that respondent inflicted physical injury on King. In reaching this finding, the trial justice relied on the evidence adduced at trial relating to respondent's removal of King's extra digit. Goncalves testified that respondent told her that he removed an extra finger on King's hand with a knife and claimed he "knew what he was doing." In respondent's own testimony, he stated that it would be "absurd" to deny knowing what happened to King's extra digit. Additionally, before us, respondent "acknowledged that he removed something from his son's hand," but argued that

"it was not 'a finger technically.'" Despite this contention, however, respondent repeatedly referenced it as a "finger" throughout his testimony.[6]

Further, this Court does not hold the trial justice's findings to be "rife with extraneous and unproven allegations that existed nowhere in the record." The respondent challenges the trial justice's mention of her own child, who required medical attention to have an extra digit removed, arguing, "[t]here was no medical evidence to help the court determine whether the protrusion on King's hand was an actual digit that necessitated a hospital visit for removal * * *." We are satisfied, however, that sufficient evidence exists elsewhere in the record supporting the trial justice's finding that respondent removed King's finger, harming him.

The respondent also contends that the trial justice's findings were "a distortion of the evidence." While we note that the trial justice mischaracterized certain testimony in her decision,[7] this Court does not conclude that the minor mischaracterizations are misconceptions of material evidence. The misinterpreted testimony accounts for just two pieces of evidence that the trial justice noted in her decision—a decision that referenced abundant evidence supporting her finding. In addition to the evidence of King's physical harm, the trial justice considered respondent's mental health issues in finding King dependent. Specifically, she looked at respondent's treatment at the VA, his "aggressive, loud and belligerent" conduct with DCYF

---

[6] During his testimony, respondent stated that "[h]e had ten and a half fingers" and "[Dr. Baron] never seen [sic] the finger or the missing finger in question."

[7] In her decision, the trial justice described an incident with a toy that appeared to scare King and another involving a skateboard as "actions or conduct on the part of [respondent] that this Court finds to be inappropriate, unsafe and at times bizarre * * *." From this Court's review of the record, however, these two instances are examples of respondent's appropriate behavior. In Goncalves's testimony about the incident with the toy, she said that respondent "was very good about the way he trying [sic] to get him not afraid of it." Regarding the skateboard incident, Goncalves testified that respondent "was good about redirecting and telling [King] not to use it."

-10-

employees, his inappropriate behavior towards King, and the appointment of a guardian ad litem on his behalf.

We conclude that the trial justice clearly "articulate[d] [her] findings concerning the welfare of the child in light of the parent's alleged misconduct." In re Crystal, Joshua, and Jacqueline A., 448 A.2d at 1229. Thus, we are of the opinion that the trial justice's finding of dependency as to King is supported by clear and convincing evidence.

**B**

**Decree of Dependency as to Saint**

The respondent argues that the decree of dependency as to Saint must also be vacated because the trial justice relied "almost exclusively" on her findings in King's dependency decree. This Court has held that "evidence of harm to one child of a family is relevant to the issues raised by a dependency-and-neglect petition regarding another child of the family * * *." In re Luz J., 447 A.2d 1148, 1152 (R.I. 1982). Having properly found King dependent as to respondent, we are satisfied that it was appropriate for the trial justice to consider the evidence of King's harm in determining Saint's dependency. See In re Nicole B., 703 A.2d 612, 618 (R.I. 1997) ("[I]t is both appropriate and permissible for a Family Court justice to consider earlier determinations concerning the neglect or abuse of one child in determining the parents' fitness, or lack thereof * * *.").

Although the trial justice noted in her decision that no evidence indicated that Saint was harmed to the extent King was harmed, "[t]here is no requirement that a court wait until a child is actually harmed before such court provides the protection of the state." In re Luz J., 447 A.2d at 1152. "The state's role in protecting [a child] may properly be preventive of harm as well as remedial." In re Lester, 417 A.2d 877, 881 (R.I. 1980). The evidence that the trial justice cited

to from King's case, including the testimony about the respondent's removal of King's extra digit with a knife and his "appalling conduct and treatment" towards the DCYF employees, established a likelihood of harm to Saint. Additionally, although the respondent contends that the trial justice solely relied on King's dependency in making a determination as to Saint, she did consider additional evidence. Specifically, the trial justice considered the respondent's failure to comply with the case plan and the ordered psychological evaluation and his belief that he did not need the plan's services. Accordingly, we conclude that the trial justice's finding of dependency as to Saint is supported by clear and convincing evidence.

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the decrees of the Family Court. The record shall be remanded to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** In re King J.
In re Saint J.

**CASE NOS:** No. 2014-277-Appeal.
(13-1241-1)
No. 2015-216-Appeal.
(13-1241-2)

**COURT:** Supreme Court

**DATE OPINION FILED:** November 3, 2016

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:** Providence County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice Karen Lynch Bernard

**ATTORNEYS ON APPEAL:**

For Petitioner:  Karen A. Clark
Department of Children Youth and Families

Bruce J. Katz
Court Appointed Special Advocate

For Respondent:  Angela M. Yingling
Office of the Public Defender